**Anthony Robert MARTIN–TRIGONA, Plaintiff–Appellant,**

v.

**Nicholas GOULETAS et al., Defendants–Appellees.**

**No. 80–1992.**

United States Court of Appeals, Seventh Circuit.

Submitted Aug. 19, 1980.*

Decided Aug. 21, 1980.**

Opinion Sept. 9, 1980.

---

* After preliminary examination of the appellant's opening brief and the record, the court notified the parties that it had tentatively decided that oral argument was unnecessary. The notice provided that any party could file a "Statement as to Need of Oral Argument." *See* Fed.R.App.P. 34(a); Circuit Rule 14(f). Neither party filed such a statement. (Counsel for the appellees did file a statement expressing the opinion that no reason for oral argument existed.) Upon consideration of the briefs and the record, the appeal is submitted for decision without oral argument.

** This appeal originally was decided by an unreported order on August 21, 1980. See Circuit Rule 35. The court subsequently decided on its own motion to issue the decision as an opinion.

Raymond D. Pijon, Paul Bradley, Anthony R. Martin- Trigona, Chicago, Ill., for plaintiff appellant.

William E. Rattner, James R. Ferguson, Asst. U. S. Atty., Chicago, Ill., for defendants ·appellees.

Before CUMMINGS, PELL and CUDAHY, Circuit Judges.

PER CURIAM.

Anthony Robert Martin–Trigona (Trigona) appeals from the order of the district court finding him to be a recalcitrant witness.[1] Pursuant to that order he has been confined to the Metropolitan Correctional Center until he answers certain questions. Trigona's two applications for bail pending appeal have been denied by this court in

---

1. In a motion addressed to Chief Judge Fairchild, the appellant moved that all judges of the Seventh Circuit be disqualified from participating in the consideration of this appeal, or, in the alternative, that all judges who participated in the appellant's previous appeal, No. 79–2048, be disqualified. Chief Judge Fairchild has declined to participate in this matter.

Motions for recusal are properly addressed only to the judge who is the object of the motion. *See* 28 U.S.C. § 455. On consideration of the motion of the appellant, each judge participating in this appeal has found no basis for recusing himself. Therefore, the motion insofar as it seeks the disqualification of Judge Cummings, Judge Pell, and Judge Cudahy is denied.

orders dated July 22, and July 31, 1980.[2] Pursuant to 28 U.S.C. § 1826(b) this appeal has been decided on an expedited basis.[3]

This appeal stems from supplementary proceedings initiated by the appellees to discover Trigona's assets. The appellees seek to collect upon a $200,000 judgment entered upon their counterclaim against Trigona in 1979. That judgment was affirmed by this court in an unpublished order earlier this year. *Martin–Trigona v. Gouletas*, 622 F.2d 592 (1980).[4] Supplemental proceedings–or a citation to discover assets–were apparently commenced because Trigona neither sought to stay the judgment nor to voluntarily satisfy it. Trigona initially did not respond to the citation and the district court, after issuing a rule to show cause, adjudicated him in contempt. This is the subject of a separate appeal now pending before this court in No. 80–1009.[5] In January 1980, the appellant appeared in district court, requested that he be purged of contempt, and represented that he was willing to respond to the citation to discover assets. The citation proceedings were then referred to a magistrate and a hearing held on February 5, 1980. At that hearing Trigona refused to answer 169 questions claiming his Fifth Amendment privilege against self–incrimination. In his report and recommendation, the magistrate found Trigona's invocation of the privilege well–taken as to certain questions, but inapplicable as to others and waived as to still others. (R.

143). The district court generally accepted the magistrate's conclusions, but afforded Trigona another opportunity to explain why the seemingly innocuous questions might elicit incriminating information. R. 148. Consequently, a renewed hearing before Judge Decker was held on July 22, 1980. At that hearing, Trigona again asserted the privilege against self–incrimination and declined to answer certain questions. Trigona also maintained that he did not know or was unable to remember the information requested in certain other questions. The district court thereupon held that Trigona could not rely on the Fifth Amendment as to some of the questions asked and that his claims of a lack of memory or absence of knowledge were made in bad faith. The court found Trigona in contempt and ordered his confinement until he answered the questions. R. 149A; Tr. at 94–100.[6]

Trigona's attack on the district court's order adjudging him a recalcitrant witness is three-pronged. First, Trigona maintains that several of the questions asked were irrelevant, *i. e.*, the information they sought to elicit could not aid in discovering his current assets. Second, Trigona declares that the district court erred in finding that his claims of lack of memory or knowledge were made in bad faith. Finally, Trigona argues that the district court improperly held that the Fifth Amendment did not shield Trigona from answering most of the remaining questions put to him.

---

2. 28 U.S.C. § 1826(b) provides that no person ordered confined as a recalcitrant witness "shall be admitted to bail pending the determination of an appeal taken by him from the order for his confinement if it appears that the appeal is frivolous or taken for delay." On July 29, 1980, the district court modified the order of confinement to provide for Trigona's temporary release for the purpose of preparing his defense in a criminal trial.

3. 28 U.S.C. § 1826(b) requires that any appeal from an order of confinement "be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal."

4. In that order this court affirmed the judgment in the amount of $75,000 compensatory damages and $125,000 punitive damages which was

awarded after Trigona defaulted on the appellees' counterclaim alleging slander of title, defamation, malicious prosecution, and interference with business relationships.

5. Another appeal pending before this court also arose from these supplementary proceedings. In No. 80–1464, the appellant, Donna Wolske, appeals from the denial of her motion to intervene in these proceedings. The issue in No. 80–1464 is generally unrelated to those presented here, except that Martin–Trigona did file an affidavit which disclosed certain matters in support of Wolske's attempt to intervene.

6. All references to "Tr." are to the transcript of the proceedings before Judge Decker on July 22, 1980, unless otherwise noted.

*Relevance*

■ Trigona objects to six questions as irrelevant. Although the relationship of the questions to Trigona's current assets was somewhat remote, we cannot say that the trial court abused its discretion in permitting inquiry into these matters.[7] "Relevant evidence means evidence having *any tendency* to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Trigona's place of birth, for example, might aid in identifying him as the owner of some assets. The location of his phone might aid in understanding his business activities. The questions concerning his line of business and ownership of bonds prior to November 1977 might aid in discovering assets which he has retained since that time. (Both of these questions were limited to the period prior to November 1977 in an attempt to assuage Trigona's professed fear of self–incrimination.)[8] The question concerning his public filings as a candidate for office could lead to current assets since often candidates are required to disclose financial interests. The question concerning his campaign committee was also relevant because the appellees had reason to suspect that Trigona was the only contributor to his campaign. Such a campaign fund might in some circumstances be regarded as a personal asset. Because the questions were aimed at eliciting relevant evidence, the trial court properly directed Trigona to answer them.

*Bad Faith Refusal to Answer*

Judge Decker found that Trigona's claimed inability to answer certain questions was a bad faith refusal to answer the questions. Trigona attacks that finding as unsupported by any "objective showing that [his] loss of memory is false." Appellant's Brief at 8. Trigona maintains that since some of the questions related to events several years ago and others concerned matters which could be outside his knowledge or experience, the district court's finding is in error.

Although Trigona's refusal to answer some of the questions could be viewed as a good faith inability to answer when the questions are reviewed in isolation, Judge Decker did not err in declining to credit Trigona's testimony. Trigona's interest in this litigation is obvious. As he himself acknowledged before the magistrate, he "dedicates his life to fighting corruption . . . (and) the American Invesco Company," one of the appellees here. It may also be fairly assumed that he has a motive not to answer questions in order to shield his assets from execution. His claim must be viewed in the light of his conduct during the course of these proceedings. Trigona has proved to be an extremely uncooperative litigant. He failed to answer the appellees' counterclaim leading eventually to the entry of a default judgment against him. He at first failed to respond to the appellees' requests to appear to answer questions in these supplementary proceedings, and he responded only after he had been found in contempt. The appellees' initial attempts to question him were met with what the trial court found was a blanket invocation of the Fifth Amendment. Against this background of intransigence, the trial court had good reason to question Trigona's credibility.

The record itself suggests that Trigona's claimed inability to answer was an attempt to evade answering the questions. When pressed, he would assert his Fifth Amendment privilege:

> The Court: Well, let's—what is—well, let's say today, what is your usual business, profession or occupation at this time?
>
> The Witness: I don't know.

---

7. The appellee's brief has not directly addressed Trigona's attack upon the relevance of these questions. This, of course, does not preclude us from finding that the trial court correctly overruled the objections to those questions.

8. These questions might also aid the appellees in ascertaining whether any fraudulent conveyances, in derogation of their rights as judgment creditors, have occurred.

The Court: Do you have any business?

The Witness: I don't know how to answer that question. I am not sure.

The Court: Are you engaged in any profession?

The Witness: I am not sure I can answer that question.

The Court: Do you have any occupation at all?

The Witness: My time at this time—

The Court: And this relates to seventy—

The Witness: —is involved in the defense of this litigation and criminal prosecution. So if you are talking about occupation by devotion of assets, I would say—

The Court: No, I am talking about—

The Witness: —then I would say about 95 percent of my time is being devoted to responding to the Gouletases and to the federal government and to the state government.

By Mr. Rattner:

Q Is that your regular business and occupation currently?

A At the present time I think I would have to say that I am a criminal defendant in the federal and state court, before grand juries, and also a potential criminal defendant in this case, and that is completely occupying my time.

The Court: Well, let's find out prior to the institution of any criminal proceedings, what was your usual business, profession or occupation?

The Witness: In view of the fact that that would covers matters involving matters which are currently pending in grand juries and also pending in federal and state prosecutions, I decline to answer that question on the basis of the Fifth Amendment.

Tr. at 72–73.

Some of the questions concerned matters which a person ordinarily would remember:

Q Did you prior to November, 1977, own any such vehicle?

A Yes.

Q What kind of vehicle?

A Oh, a number of cars over the years.

Q What was the car that you owned prior to November 1977?

A I don't remember.

Tr. at 55.

Q Do you own a boat?

A Do I currently own a boat?

Q Yes.

A No, not that I am aware of.

Q Did you own a boat prior to November, 1977?

A I don't remember. Probably not.

Tr. at 56. The only explanation that Trigona offered for these lapses of memory was not credited by the trial court. *See* Tr. at 97. After a long series of questions answered by "I don't know" or "I don't remember" Trigona offered this explanation:

The Witness: I might just point out for the record that I am taking pills; that these pills can sometimes affect my memory and that this medication was prescribed by a physician and—I am not sure that not taking them would help but as to these old, old transactions I must say that my recollection is virtually nonexistent.

By Mr. Rattner:

Q What medication are you taking that involves your memory? What is the name of the drug?

A I am going to invoke the privilege against self–incrimination, as has been previously set forth.

Mr. Rattner: Well, I sure don't know, Judge, how that can incriminate him.

The Court: Well, I will direct you to answer the question. You have raised the point that you are having some problems with your memory today and it may be by reason of certain pills that you are taking.

He simply asked the question, "What are you taking in that connection?"

The Witness: I don't believe that that question can properly lead to discoverable assets, your Honor, on the basis and that—and that on the basis that it can't lead to discoverable assets—

The Court: It leads only to the question as to whether or not today you are having some problem with your memory because of medication. You raised the issue.

The Witness: I don't know. I just raised the point as a courtesy to the Court. I

am not a doctor; I can't make medical conclusions.

Tr. at 37–38.

■ Questions concerning the credibility of witnesses are by their very nature questions for the trier of fact. In this case, ample reason existed for Judge Decker to discredit as feigned Trigona's claims of lack of memory or knowledge. Judge Decker had the opportunity—which this court does not—to observe the demeanor of the witness while on the stand and to thus assess his credibility. Nothing in the record suggests that Judge Decker's finding was incorrect. We decline to disturb that finding absent an affirmative showing, not made here, that it was wrong.

### Self–Incrimination

Martin–Trigona's final allegation of error is the trial judge's direction to answer certain questions notwithstanding his assertion of his privilege against self–incrimination. Trigona's brief sets forth only nine questions to which he claimed the privilege,[9] but the record reveals he invoked the Fifth Amendment much more.

The foundation for Trigona's Fifth Amendment claim is the pendency of several criminal charges or criminal investigations against him. State criminal charges are presently lodged against him for alleged theft and forgery in connection with the endorsement and negotiation of a $267,000 insurance draft in 1977. In April 1980, a federal grand jury in the Central District of Illinois indicted Trigona on charges of mail fraud allegedly committed in 1977 in connection with Trigona's attempt to secure a mortgage.[10] Moreover, Trigona informed the trial court that he had reason to believe he was under investigation by a grand jury

**9.** Trigona's brief objects to the following questions:

> (i) What is your place of birth (T. 14–21)
> (ii) Mr. Martin–Trigona, are you presently a plaintiff in any civil action pending in any state or federal court in the United States? (T. 23)
> (iii) Tell us what other civil cases, other than what we have called the "Morris litigation," other than that, tell us what other civil cases are now pending in which you are a claimant, either a plaintiff or a counterplaintiff, and are seeking damages from some other party or parties or entities? (T. 24)
> (iv) Who pays the telephone bill for number 467–6760 to the Illinois Bell Telephone Company? (T. 28)
> (v) If you live in a private house, who owns it? (T. 28)
> (vi) Who is the recipient? (of a trial subpoena in the appellant's federal indictment) (T. 50)
> (vii) Where in Chicago, Illinois? (referring to present residence) (T. 67)
> (viii) Do you have a campaign committee? (T. 70)
> (ix) Are you the owner of any legal interest, such as a fee interest or long–term tenant or a joint interest in any real estate? (prior to 1977) (T. 86)
> Appellant's Brief at 6.

**10.** Trigona's explanation to Judge Decker of the nature of the charges pending in the Central District was vague and unhelpful. *See* Tr. at 5–9. His attorney provided the following explanation to the district court:

> My understanding of that case, and maybe I can be a little more clear than Mr. Martin–Trigona was earlier, is that he is charged with an eight count mail fraud indictment based on some mailing of letters in connection with one transaction which was the seeking of a mortgage on some property.
> The question in the criminal case is whether or not he owned that property at the time he sought the mortgage on it. And my understanding of the case is the question of ownership of that property goes back to 1970 or 1971 when he entered into a contract to buy that property.

Tr. at 90–91. See also the news item attached to Trigona's response to counterplaintiff's memorandum (R. 137):

> Jury Indicts Martin–Trigona
> Springfield, Ill. (AP)–Anthony R. Martin–Trigona, the political maverick who unsuccessfully sought the Democratic U. S. Senate nomination, was indicted Tuesday on mail fraud charges in an alleged $42,000 loan scheme.
> Martin–Trigona, who in the recent primary campaign accused an opponent of corrupt and improper acts, was charged by a federal grand jury with fraudulently obtaining a $42,-800 loan from the Citizens Building Association of Urbana.
> Martin–Trigona, 34, a Chicago millionaire who has had frequent battles with the legal system, said he is innocent and called the indictment a "political smear."
> The indictment alleges that Martin–Trigona tried to create the false impression that he

in the Northern District of Illinois, but was unable to ascertain the scope of the investigation. Certainly, Trigona's fears of criminal prosecution are well–founded and the trial court so held.

■ Yet the pendency of criminal proceedings does not by itself excuse a witness of his obligation to give testimony in civil proceedings. Some nexus between the risk of criminal conviction and the information requested must exist.

The privilege afforded not only extends to answers that would in themselves support a conviction under a . . . criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a . . . crime. (*Patricia*) *Blau v. United States*, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950). But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. *Mason v. United States*, 244 U.S. 362, 365, 37 S.Ct. 621, 622, 61 L.Ed. 1198 (1917), and cases cited. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified. *Rogers v. United States*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951), and to require him to answer if "it clearly appears to the court that he is mistaken." *Temple v. Commonwealth*, 75 Va. 892, 899 (1881). However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of

why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." *See* Taft, J., in *Ex parte Irvine*, 74 F. 954, 960 (C.C.S.D.Ohio, 1896).

*Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). Thus a witness need not establish that an answer to a question or an explanation why an answer cannot be given will in fact incriminate. He must, however, tender some credible reason why a response would pose a real danger of incrimination, not a remote and speculative possibility. *See Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 478, 92 S.Ct. 1670, 1674, 32 L.Ed.2d 234 (1972). The ultimate question of whether the privilege is properly invoked is one for the judge. VIII Wigmore on Evidence § 2271 (McNaughton rev. 1961).

Trigona argues that the pendency of criminal charges and investigations concerning some of his financial affairs establish his justification for his refusal to answer the questions concerning his assets and personal life. Moreover, with respect to the state charges, he advances a more direct explanation as to why answers might be incriminating. His brief explains that "state authorities have subpoenaed records for transactions occurring long after the date of the alleged offense on the theory that subsequent use of funds could be used to prove intent at the time of taking." Appellant's Brief at 9.

The trial court did uphold Trigona's right to invoke the privilege as to certain current assets which might reveal the existence of financial transactions during or since 1977. *See, e. g.,* Tr. at 86; R. 148. However, the district court directed Trigona to answer questions concerning his assets prior to 1977 and to explain more fully why responses to

---

held title to real estate used as security for the loan by filing fraudulent deeds with the Champaign County recorder's office. The in-

dictment said that based on this material, he received the loan in December, 1977.
(Chicago Sun–Times, April 9, 1980).

other questions concerning his assets might be incriminating.

■ Trigona finds fault with the trial court's direction that he explain in greater detail why responses to certain questions might prove incriminating. Under the circumstances of this case, the trial court did not abuse its discretion in requiring some additional explanation. In fact, before the district court Trigona's attorney requested the opportunity to offer additional explanation. Tr. at 12. The questions appear innocuous on their face. Their relationship to the criminal actions against the witness is remote.[11] At least one of the questions relates to matters to which Trigona had testified about during the course of the proceedings. Question (vii), for example, asks for Trigona's present address in Chicago. On January 10, 1980, Trigona voluntarily informed the court of his Chicago address. *See* Tr. of 1/10/80 at 10. He did the same in the proceedings before the magistrate. *See* R. 143. The questions concerning litigation involving Trigona, his place of birth, the payment of telephone bills, and the existence of a campaign committee have only the most tenuous relationship to any potentially incriminating financial transactions. The only explanation that Trigona tendered for declining to answer these questions was as follows:

> All of my personal records and financial transactions are intermixed and commingled in accounts that have gone on for a number of years and which relate to—and have processed transactions prior to 1977 and subsequent to 1977.

**11.** The only question which arguably might be regarded as calling for a potentially incriminating response was "were you the owner of any legal interest, such as a fee interest or long–term tenant or a joint interest in any real estate prior to 1977." This inquiry might elicit a response relevant to the transactions forming the basis of criminal proceedings in the Central District of Illinois, because although the alleged fraud occurred in 1977, the property, according to Trigona's attorney, was purportedly purchased in 1970 or 1971. In the proceedings before the district court, however, the question was apparently not regarded as reaching to that property. *See* Tr. at 91:

Therefore, as a practical matter, all of my assets, bank accounts, financial records and related type of documents and personal information are intermixed and commingled. I cannot release portions thereof or segregate them without, as it were, pointing the way to federal and state prosecutors and infringing on my rights under the Fifth Amendment.

Tr. at 17. Finally, Trigona himself voluntarily submitted an affidavit which revealed certain information concerning his business and holdings in real estate in support of Wolske's attempt to intervene. *See* note 5 *supra*. Clearly some additional explanation was called for and the district court correctly concluded that Trigona could safely offer additional explanation without risking incrimination from the explanation itself.

The trial court was not bound to accept at face value what little explanation Trigona did offer in support of his Fifth Amendment claim. "It is clear that the trial court has the discretion to assess the facts which underlie an asserted claim of Fifth Amendment privilege." *In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 871 n.5 (7th Cir. 1979). "The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'" *Hoffman v. United States*, 341 U.S. at 487, 71 S.Ct. at 818. Judge Decker here considered the appellant's claims, gave him several opportunities to explain his basis for declining to answer seemingly innocuous questions and concluded:

> The Court: Well, there was no questions in this proceeding directed to that transaction, were there?
> Mr. Bradley: Well, not that transaction, your Honor . . . .

We therefore regard the question as posing no realistic risk of incrimination in the context in which it was asked. Trigona is, of course, entitled to the protection of the privilege with respect to questions directed toward the mortgage transaction forming the basis of the indictment, the ownership of the land subject to the mortgage, and his activities in connection with those subjects.

There can be no question from the hearing before the magistrate or from the hearing before me on this date that this respondent is not willing to answer questions in connection with the pending proceedings, any questions that would be of any assistance whatsoever to the inquiry which is the basis for this proceeding, and that is to determine whether or not he has any assets, or ever had any assets that may be available or could be available for the collection of the indebtedness that is due here.

Tr. at 95. The trial court reasonably concluded that Trigona's claim of commingling was speculative and overbroad and that the privilege was claimed in bad faith in order to hinder the appellees from collecting upon their judgment. There is ample reason to believe that Trigona's claimed fear of self-incrimination is fanciful. The tendency of this witness to exaggerate, to believe himself the victim of conspiracies where none exist, and to suspect without any reasonable basis that others are persecuting him is evident from many of his filings in this record.[12] The evasiveness of this witness, his discredited claims of lack of memory, his failure to offer any credible explanation as to how answers to seemingly innocuous questions might be incriminating, his personal interest in frustrating the efforts of the appellees to collect upon their judgment are "peculiarities of the case" which the trial court could properly consider in directing the appellant to answer. The failure of Trigona to obey those directions was properly found to constitute contempt of court.

We conclude that Judge Decker correctly found that Trigona refused without just cause shown to comply with the orders of the court directing him to answer questions concerning his assets. 28 U.S.C. § 1826(a). Accordingly, the Clerk of this court is directed to enter judgment affirming the order of the district court.

Affirmed.

---

12. *See, e. g.*, R. 3 (Motion to Reassign Case to New Judge–"Plaintiff seriously doubts he can get a fair trial from any of the Nixon–Agnew–Percy–Jenner–Ford judges, or machine judges . . ."); R. 105 (Affidavit of Anthony R. Martin–Trigona–"I have taken the Court's remarks in the past as amounting to threats and efforts to intimidate me. While I am advised by counsel that the court surely intended no such intimidation, I am unable to accept counsel's advice and persist in the unshakable belief that Judge Decker has an intense personal hostility against me").

In his reply brief, Trigona's counsel has represented to this court that "at the commencement of the criminal trial in Danville, Illinois the name of William Rattner, attorney for the appellees was read by the United States Attorney as a potential government witness." Counsel therefore argues that "the apparent cooperation" between the government and counsel for the appellees provides a reasonable basis for Trigona's Fifth Amendment claim. A similar claim of cooperation between the appellees and the government was made by Trigona before the district court. *See* Tr. at 18–19.

This fact, if true, of course bears on the reasonableness of Trigona's fear of incrimination, but under the circumstances of this case, we do not believe that the trial court erred in declining to give it particular weight or that it contradicts the trial court's conclusion that the danger of incrimination was fanciful and imaginary. First, the danger of incrimination must be judged in the light of the implications of the particular questions asked and, as we have noted above, there appears to be no danger of incrimination from the questions at issue here. Second, a legitimate reason why the government may wish to call the attorney for the appellees is apparent in this case. Among the facts at issue in Trigona's criminal trial is whether he caused to be recorded with the Champaign County recorder's office fraudulent deeds. *See* note 10 *supra*. Among the allegations in the appellee's counterclaim in the instant case was that Trigona caused to be filed in the office of the Cook County Recorder of Deeds a false deed. The similarity of these wrongful acts suggests that the government intends to introduce evidence of the Cook County transaction in order to prove opportunity, intent, plan, or absence of mistake or accident with respect to the conduct in Champaign County charged in the indictment. Whether Trigona actually committed the conduct alleged in either case is not an issue here. A judgment by default has already been entered on the appellees' counterclaim concerning the Cook County deed. None of the questions asked during these supplementary proceedings relate to any right, title, or interest that Trigona may have claimed with respect to the lands in Champaign County. *See* note 11 *supra*.