GEORGE C. PRATT, Circuit Judge.
 

 This case presents yet another chapter in the long-running story of perhaps the most prolific litigator in this circuit’s history, Anthony R. Martin-Trigona, whose trials and tribulations have been well documented by this and other courts. For a sample of Martin-Trigona’s multi-faceted litigation career, we refer the uninitiated reader to,
 
 e.g., United States v. Martin-Trigona,
 
 756 F.2d 260 (2d Cir.1985);
 
 Martin-Trigona v. Belford,
 
 732 F.2d 170 (2d Cir.),
 
 cert. denied,
 
 — U.S. -, 105 S.Ct. 191, 83 L.Ed.2d 124 (1984);
 
 Martin-Trigona v. Skiff,
 
 702 F.2d 380, 382 (2d Cir.1983);
 
 Martin-Trigona v. Smith,
 
 712 F.2d 1421 (D.C.Cir.1983);
 
 Martin-Trigona v. Gouletas,
 
 634 F.2d 354 (7th Cir.),
 
 cert. denied,
 
 449 U.S. 1025, 101 S.Ct. 593, 66 L.Ed.2d 486 (1980);
 
 Martin-Trigona v. Underwood,
 
 529 F.2d 33, 34 (7th Cir.1975);
 
 Martin-Trigona v. Lavien (In re Martin-Trigona),
 
 573 F.Supp. 1237 (D.Conn.1983);
 
 Martin-Trigona v. Lavien (In re Martin-Trigona),
 
 573 F.Supp. 1245 (D.Conn.1983);
 
 In re WHET, Inc.,
 
 33 B.R. 424 (Bankr.D.Mass.1983).
 

 In the case now before .us, the debtor corporation, New Haven Radio, Inc., appeals from an order of the United States District Court for the District of Connecticut, José A. Cabranes,
 
 Judge,
 
 that modified a previous order and approved the sale of the corporate debtor’s assets, which constituted AM radio station WNHC. The modification reduced the purchase price for the station’s assets from $500,000 to $430,000. Before applying for this order, the trustee secured approval of the modification from the debtor’s largest secured creditor, Capital Cities Corporation (Capital), which also agreed to an equivalent $70,000 reduction of its claim against the debtor.
 

 New Haven Radio, Inc. was incorporated in Connecticut on July 18, 1977, with Martin-Trigona its sole stockholder and president. On May 30, 1980, the Connecticut Secretary of the State declared its corporate charter forfeited pursuant to Connecticut General Statutes § 33-387 (1984). Instead of seeking reinstatement of the corporate charter as permitted by statute,
 
 id.
 
 at § 33-388, the corporation filed a voluntary petition in bankruptcy as described below. Ultimately the district court approved a liquidating plan for sale of the debtor’s assets and payment of all claims and expenses, with the major creditor agreeing to accept less than full payment. After three days of hearings the district court approved the revised contract of sale at the reduced price.
 

 A notice of appeal to this court on behalf of New Haven Radio, Inc. was filed on May 25, 1984, by Paul Taylor, Esq., who had represented the corporate debtor in the proceedings below. In July 1984 Mr. Taylor requested and was granted permission to withdraw his appearance. Martin-Trigo-na personally then filed on behalf of the corporation a record on appeal and brief. The trustee moved to strike both on the ground that a corporation must be represented by an attorney. On October 18, 1984 we granted the motion, stating: “Unless an entry of appearance by counsel is filed with the . Clerk of this Court on behalf of the plaintiff-appellant, New Haven Radio, Inc. on or before October 15, 1984, the appeal shall be dismissed by the Clerk without further notice.” Thereafter, George Collins, Esq., of Collins and Uscian, Esqs., of Chicago, Illinois filed a notice of appearance, and by order filed on January 7, 1985 this court granted permission to Christopher Bargione, Esq., of the same firm to appear
 
 pro hac vice
 
 and argue the appeal on behalf of New Haven Radio, Inc.
 

 On appeal, the debtor raises a number of objections to the proposed sale, some of which have been raised in related proceedings, some of which were raised below, and
 
 *1337
 
 others of which are raised for the first time on this appeal. Finding no merit in any of the objections, we affirm the order of the district court.
 

 BACKGROUND
 

 On September 10, 1980, the law firm of Gellis & Mellinger filed a voluntary petition for Chapter 11 reorganization in the Southern District of New York listing as debtor, New Haven Radio, Inc. The petition was signed by Jan Ira Gellis of the same firm; its supporting “declaration” identified Anthony Martin-Trigona as president of the corporation and sole stockholder, stated that “the filing of this petition on behalf of the corporation has been authorized”, and was signed “Anthony Martin-Trigona by POA [power of attorney] J.I. Gellis”. At the time, Martin-Trigona was imprisoned in Illinois on a mail fraud conviction that was later reversed on appeal.
 
 United States v. Martin-Trigona,
 
 684 F.2d 485 (7th Cir.1982). On December 2, 1980, Martin-Trigona, represented by the Gellis firm, also filed for personal bankruptcy in the Southern District of New York.
 

 On October 10, 1980, the United States trustee, pursuant to an order of the bankruptcy court, appointed Nicholas Bua trustee of the estate of the corporate debtor. This appointment remained in effect until December 8, 1980. Martin-Trigona was released on bail pending appeal of his mail fraud conviction at about this time, and he caused the corporate debtor to seek an order from the bankruptcy court to operate the radio station as debtor in possession. The bankruptcy court granted this order on the condition that Martin-Trigona make himself available to assist in the orderly administration of the debtor’s estate.
 
 See In re New Haven Radio, Inc.,
 
 23 B.R. 762, 767 (S.D.N.Y.1982).
 

 Soon thereafter, however, Martin-Trigo-na’s criminal appeal bond was revoked and he was recommitted, whereupon Capital moved for reappointment of a trustee, based primarily on its concern that Martin-Trigona’s absence would hamper the proper and effective administration of the estate, and that his conviction and imprisonment for a crime might adversely impact upon the value of the property since it could be a factor that the FCC might consider when it reviewed the radio station’s application to renew its license. The bankruptcy court granted this motion on January 20, 1981 and, pursuant to 11 U.S.C. § 1106(a), Daniel Meister was appointed trustee and has to this date continued to act in that capacity.
 

 Capital also moved to transfer the bankruptcy proceeding to the District of Connecticut on the ground of improper venue, based on the facts that the sole asset of the debtor was located in Connecticut and that most of the creditors listed in the petition had their places of business in Connecticut. The bankruptcy court also granted that motion. The order changing venue and the order appointing Meister as trustee were both affirmed by the district court,
 
 In re New Haven Radio, Inc.,
 
 23 B.R. 762, and this court subsequently dismissed the debt- or’s appeal from the order, affirming the transfer.
 
 In re New Haven Radio, Inc.,
 
 No. 84-5003 (2d Cir. Sept. 12, 1984) (mem.).
 

 Upon transfer to the Connecticut bankruptcy court the corporate bankruptcy was consolidated with Martin-Trigona’s personal bankruptcy which had also been similarly transferred.
 
 See Martin-Trigona v. Lavien (In re Martin-Trigona),
 
 573 F.Supp. at 1249. Judge Alan Shiff and later Judge Robert Krechevsky, both of the bankruptcy court in Connecticut, presided over these consolidated cases. Initially, Martin-Trigo-na sought to intervene personally in the corporate bankruptcy, claiming that as sole shareholder of the corporation he was actually the debtor and that the corporation was merely his alter ego. Judge Shiff denied this motion, rejecting the claim that the debtor corporation was Martin-Trigo-na’s alter ego, and holding that under Bankruptcy Rule 724 he personally had no right to intervene in the proceedings. Whatever potential residual interest Martin-Trigona had in New Haven Radio, Inc. that might have accorded him a right to intervene rested not with him, but with the
 
 *1338
 
 trustee of the estate in his personal bankruptcy case. Thus, the court reasoned, Martin-Trigona had no cognizable “interest” that would have allowed him to intervene in the corporate proceeding “as of right” under the rule. The court further ruled that permissive intervention would be inappropriate because Martin-Trigona’s various claims were collateral to the main action and threatened to hinder the orderly administration of the corporate debtor’s estate.
 
 See In re New Haven Radio, Inc.,
 
 18 B.R. 495 (Bankr.D.Conn.1982). This order was affirmed by the district court.
 
 In re New Haven Radio, Inc.,
 
 No. 5-82-152 (D.Conn. Oct. 22, 1982) (Burns, J.).
 

 In April 1982 Judge Shiff confirmed a plan of corporate reorganization which called for the sale of the radio station, and payment in full of the claims of all the estate’s creditors. At a hearing before Judge Krechevsky on the value of the station’s assets, Martin-Trigona testified extensively as to what he considered their value to be. In his view, which was based primarily on the sale of what he considered to be a comparable radio station in the New Haven area, the station was worth approximately $1,300,000 to $1,500,000. In contrast, a professional appraisal firm, the Holt Corporation, conducted a detailed appraisal and concluded in June 1981 that the station’s assets had a value of between $475,000 and $525,000.
 

 At a public auction held in June 1982, the highest bid received for the station was $375,000, from Wardoco, Inc. While the other claims and administration expenses could easily be paid from the sum, it was not nearly enough to satisfy Capital’s secured claim which exceeded $650,000. Because of this, and because the appraised value of the station was much higher than Wardoco’s offer, Judge Krechevsky refused to approve the bid. Wardoco then increased its offer to $500,000, and Capital agreed to reduce the amount of its claim so as to provide for total recovery by all the unsecured, administration, and priority creditors, with the remainder going to Capital. In December 1982 Judge Krechevsky entered an order authorizing the trustee to sell the corporate assets to Wardoco for $500,000.
 

 Even though he had been denied the right to intervene, Martin-Trigona continued to file numerous interlocutory appeals from orders of the bankruptcy court pertaining to the corporate bankruptcy, as well as to his personal bankruptcy, and he also sought to commence related actions in the district court. Almost without exception the actions and appeals Martin-Trigona sought to maintain in the district court were either dismissed as frivolous or otherwise summarily disposed of. Nevertheless, because of the sheer volume of the filings, the district court determined that the most efficient administration of all the litigation involving Martin-Trigona could be best achieved by assigning all the cases to a single district judge. As a result all pending cases involving Martin-Trigona were transferred in January 1983 to Judge Ca-branes.
 
 See Martin-Trigona v. Lavien (In re Martin-Trigona),
 
 573 F.Supp. at 1249-50 n. 8.
 

 In June 1983 the trustee in Martin-Trigo-na’s personal bankruptcy sought to question Martin-Trigona as authorized by the Bankruptcy Rules. Martin-Trigona refused to answer several questions, claiming a fifth amendment privilege against self-incrimination. Upon application by the United States Attorney, Judge Cabranes granted Martin-Trigona use immunity under 18 U.S.C. § 6003. At a hearing held on January 3, 1984, Martin-Trigona still refused to testify, again asserting his privilege against self-incrimination. After Judge Ca-branes ordered Martin-Trigona to answer the questions put to him by the trustee’s counsel and he refused, Judge Cabranes found him to be in civil contempt and ordered him incarcerated. Martin-Trigona’s incarceration was stayed pending appeal to this court. We affirmed,
 
 Martin-Trigona v. Belford,
 
 732 F.2d 170 (2d Cir.),
 
 cert. denied,
 
 — U.S. -, 105 S.Ct. 191, 83 L.Ed.2d 124 (1984), and Martin-Trigona was incarcerated at the Danbury Correctional Facility in Danbury, Connecticut, until his release on March 12, 1985, by order of
 
 *1339
 
 Judge Dorsey, to whom the case had been reassigned.
 

 Meanwhile, Wardoco withdrew its bid to purchase the radio station, apparently because of the delay caused by the numerous motions and interlocutory appeals filed by Martin-Trigona. The trustee attempted to find other purchasers but was unsuccessful. Wardoco then made a third offer to purchase the station, but this time at a price of $430,000. After Capital agreed to further reduce its recovery by an additional $70,000, and also to accept a note for its share of the purchase price, the trustee signed the contract.
 

 When the parties applied to the court for approval of the contract and a modified order of sale, Judge Cabranes ordered the trustee to give notice to all creditors by mail and to advertise the prospective sale in
 
 Broadcast Magazine
 
 and the
 
 Wall Street Journal.
 
 Additionally, he ordered the preparation of a current appraisal by the Holt Corporation, the same firm that had prepared the 1981 appraisal. The court then held an evidentiary hearing which began on March 27, 1984, and was continued on April 25 and April 30, 1984. The prospective purchaser’s principal, the trustee, the radio station’s manager, and the appraiser all testified and were cross-examined by counsel for the debtor. In the opinion of the appraiser the radio station then had a value of between $425,000 and $450,000. Counsel for the debtor represented to the court that he would obtain and submit an independent appraisal of the corporation’s assets, but no such appraisal was ever submitted.
 

 Martin-Trigona, at the time incarcerated under the civil contempt finding, sought to participate in this hearing. The court denied the request, concluding that Martin-Trigona had no standing to participate either as guarantor of the corporate debts or as “residual owner” of the station, based on the earlier decision of the district court affirming Judge Shiff’s denial of Martin-Trigona’s motion to intervene. Judge Ca-branes further ruled that Martin-Trigona was not competent to testify as an expert witness as to the station’s value, because he had not been qualified as an expert under Fed.R.Evid. 702. Nor was he entitled to give opinion testimony as a lay witness under Fed.R.Evid. 701, because he lacked the requisite knowledge of the facts, not having been in possession of the radio station or involved in its day-to-day operations for the previous two years. The debt- or corporation presented no other witnesses at the hearing, nor did it produce any other evidence of value or even a prospective purchaser willing to bid on the station. On May 4, 1984, the court approved the sale of the debtor corporation’s assets to Wardoco for $430,000, and this appeal followed.
 

 Discussion
 

 The debtor raises numerous objections to the proceedings and the order approving the modified order of sale. We shall consider them seriatim.
 

 A.
 
 Subject Matter Jurisdiction
 

 There are four challenges to the court’s “jurisdiction” over this action. First, the debtor contends that this case was never lawfully transferred from the Southern District of New York to the District of Connecticut. While more accurately classified as a challenge to venue rather than jurisdiction, this contention is, in any event, meritless. The debtor took an appeal from the bankruptcy court’s order of transfer, and Judge Weinfeld, in a thorough opinion,
 
 In re New Haven Radio, Inc.,
 
 23 B.R. 762 (S.D.N.Y.1982), rejected its claim that the transfer was invalid, stating “the factors favoring the transfer were overwhelming”, 23 B.R. at 766, since the sole asset of the corporation as well as most of its creditors were located in Connecticut.
 
 Id.
 
 at 765. Moreover, this court dismissed the debtor’s appeal from Judge Weinfeld’s order because the debtor had failed to pay the required court fees.
 
 In re New Haven Radio, Inc.,
 
 No. 83-5003 (2d Cir. Sept. 12, 1984). Thus, having been previously adjudicated, the claim is not now properly before this court.
 

 
 *1340
 
 The debtor next challenges “jurisdiction” with the claim that the corporation had never become a valid corporation. Although some incorporation papers were filed with the Connecticut Secretary of the State, Martin-Trigona claims that other required papers, including a report of the initial shareholder’s meeting, were not filed. This claim was first raised before the district court at the hearing on April 30, 1984, but no evidence was presented to substantiate it. Curiously enough, after argument of this appeal Martin-Trigona submitted to us copies of documents apparently obtained from the office of Connecticut’s Secretary of the State which indicate that the corporation’s certificate of incorporation was filed in Connecticut on July 18, 1977, and that on May 30, 1980 its certificate was forfeited and the corporation dissolved.
 

 This claim of defective incorporation must be rejected. First, it is not supported by evidence. Second, even if the corporation was not legally formed, it has held itself out as a corporation from mid-1977 until well into this litigation, so that it has acquired status as a
 
 de facto
 
 corporation, and any challenge to its corporate existence as a result of an improper filing must fail.
 
 See Yale Co-op. Corp. v. Rogin,
 
 133 Conn. 563, 53 A.2d 383, 385 (1947);
 
 Tieman v. Savin Rock Realty Co.,
 
 115 Conn. 473, 162 A. 11, 14 (1932). Third, in view of the untimeliness of this claim, the debtor is otherwise estopped from asserting a defect in its own incorporation procedures as a reason for dismissing this voluntary bankruptcy proceeding.
 

 The debtor’s third challenge to the court’s jurisdiction is based on its claim that neither Martin-Trigona, who was president and sole stockholder of New Haven Radio, Inc., nor anyone else eter authorized the filing of the voluntary bankruptcy petition. The petition of the debtor to the Southern District of New York in 1980 shows that it was filed by Jan Gellis of the law firm Gellis & Mellinger.
 
 See In re New Haven Radio, Inc.,
 
 23 B.R. at 764. Gellis also signed Martin-Trigona’s name to the supporting declaration indicating that he did so under a power of attorney from Martin-Trigona. The record contains no document evidencing such a power of attorney, nor does it contain any documentary evidence of an express authorization to Gel-lis to file the petition on behalf of the corporation. Gellis was never called to testify before the district court nor was any affidavit from him submitted. To fill this evidentiary lacuna, the trustee moved on March 7, 1985, to supplement the record with an affidavit by Gellis stating that he had authority to file the petition. Simultaneously with the filing of this opinion we are denying that motion as procedurally improper, but without prejudice to an application to the district court. We are satisfied that even without the affidavit the record sufficiently supports the district court’s conclusion that the debtor authorized the proceeding.
 

 Although the debtor casts this issue as one of subject matter jurisdiction, it is not; the bankruptcy court acquired subject matter jurisdiction over this bankruptcy proceeding when the petition was filed. In effect, the issue is whether the court has “personal” jurisdiction over the corporation, and the pertinent questions are whether Gellis had authority to file the petition as the corporation’s agent, and if he did not have such authority at the time of filing, whether the corporation, through its subsequent actions, ratified and accepted the filing.
 

 With the issue thus framed, we turn to the facts. To begin with, any claim that Gellis had no authority to file the petition on behalf of Martin-Trigona as corporate president and sole stockholder is significantly belied by at least six specific facts showing that Martin-Trigona acquiesced in Gellis’s subsequent representation of the corporation in the bankruptcy proceeding, actively participated in the proceeding without challenging the court’s “jurisdiction”, and held Gellis out as representing both himself and the corporation.
 

 1. After the petition was filed, Gellis, without objection from anyone, represented
 
 *1341
 
 the corporation in these proceedings from September 1980 until June 1981, during which time Martin-Trigona not only had notice of, but also participated significantly in the proceedings.
 

 2. In a “Statement of Financial Affairs for Debtor Engaged in Business”, filed in the Bankruptcy Court for the Southern District of New York in January 1981, Martin-Trigona listed Gellis as the corporation’s attorney. The form requires that the statement be certified by a duly authorized officer of the corporation. In compliance, Martin-Trigona signed the document indicating that he was president of the debtor corporation.
 

 3. On June 15, 1981, Martin-Trigona caused to be filed with the bankruptcy court two groups of unsecured claims against the debtor corporation, one for $224,093, the other for $240,000. Both forms were signed by Martin-Trigona “as assignor”; both stated that he “resides at c/o Gellis & Melinger [sic], 2 Pennsylvania Plaza, New York New York 10121”.
 

 4. In February 1981, as president of New Haven Radio, Inc., Martin-Trigona signed and caused to be filed a proof of claim for $20,000 in a bankruptcy proceeding then pending in the district of Massachusetts,
 
 In re WHET, Inc.,
 
 33 B.R. 424 (Bankr.D.Mass.1983). In the claim he stated that he resided “c/o Gellis & Melinger [sic], Two Penn Plaza, New York, N.Y. 10121.”
 

 5. In support of the present proceeding, which was brought under Chapter 11 of the bankruptcy code, Martin-Trigona as “duly authorized agent”, signed a document entitled “debtor’s proposed plan of reorganization” which was filed with the bankruptcy court in January 1982. The first sentence thereof reads, “Debtor filed its petition for relief in September, 1980 in the Southern District of New York.”
 

 6. Along with the proposed plan of reorganization Martin-Trigona submitted over his signature the required “disclosure statement” of New Haven Radio, Inc., indicating that he signed it as “sole shareholder”. In that statement he stated that the corporation, not himself personally, owns and operates the radio station. He further asserted, “In September, 1980, Debtor filed a petition for relief in the Southern District of New York.” Martin-Trigona also stated, “Debtor has challenged and will continue to challenge every effort of Meister and CapCities to * * * oust Debtor from its reorganization and rehabilitation remedies, under Chapter 11 of the Bankruptcy Reform Act.”
 

 Thus, even were we to assume,
 
 ar-guendo,
 
 that Gellis initially had no authority to file the petition, we would be forced to conclude that both Martin-Trigona and the corporation acquiesced in and ratified Gellis’s action by their ongoing participation in these proceedings without raising any challenge to the validity of the filing until December 1983, over three years into this litigation. If a corporation acquires or is charged with knowledge of an unauthorized act undertaken by someone on its behalf, and does not repudiate that act within a reasonable time, but instead acquiesces in it, the corporation is bound by the act.
 
 Cohen v. Holloways’ Inc.,
 
 158 Conn. 395, 260 A.2d 573, 580 (1969);
 
 see Matter of Newmark,
 
 20 B.R. 842, 857 (Bankr.E.D.N.Y.1982); 2A W. Fletcher,
 
 Cyclopedia of the Law of Private Corporations
 
 § 752 (rev. perm. ed. 1982); 19 C.J.S.
 
 Corporations
 
 § 1019 (1974).
 

 Here, the debtor corporation and Martin-Trigona have not only acquiesced in commencement of the voluntary bankruptcy proceeding but have taken advantage of the benefit of the statutory stay against creditors’ collection actions and have even filed a reorganization plan and disclosure statement on behalf of the corporation. Furthermore, Martin-Trigona himself has filed, ostensibly on behalf of the corporation, a plethora of motions, requests, objections, and responses pertaining to these proceedings. He has even filed a civil RICO claim in the United States District Court for the District of Columbia against the trustee, his attorney, the FCC, and others.
 
 See Martin-Trigona v. Smith,
 
 712 F.2d 1421 (D.C.Cir.1983). Yet, at no time
 
 *1342
 
 until late 1983 did he or the corporation raise, either by motion or otherwise, any claim that the initial bankruptcy filing was unauthorized. Since the corporation obviously knew of the filing, and instead of repudiating it, fully participated in the bankruptcy proceedings, the corporation is bound by the filing on its behalf and cannot now claim that it was unauthorized.
 

 The final challenge to jurisdiction was not raised until after oral argument when Martin-Trigona personally filed with the court documents including a certificate of the. Connecticut Secretary of the State showing that the corporation had been dissolved because its certificate of incorporation was forfeited on May 30, 1980. This submission by Martin-Trigona reflects a characteristic disregard of court orders, inasmuch as an earlier panel of this court had rejected his attempt to appear personally on behalf of the debtor. In order to avoid any possibility of future litigation on the point, however, we will address the claim on the merits. Martin-Trigona argues that since the corporation had been dissolved in May of 1980, it lacked capacity to commence a voluntary bankruptcy proceeding four months later in September 1980. Consequently, Martin-Trigona concludes, there was no corporation in existence and all of the corporate bankruptcy proceedings to date are a nullity.
 

 We reject this last, desperate attack on the bankruptcy court’s jurisdiction over the liquidation of the New Haven radio station. Part X of Connecticut’s law of corporations provides various methods for dissolution of a corporation, one of which is “by forfeiture action by the secretary of the state pursuant to the provisions of § 33-387”. Conn.Gen.Stat. § 33-375 (1975). Under § 33-387, the Secretary of the State is authorized to “effect the dissolution of a corporation by forfeiture” for various reasons including the failure to file the first annual report,
 
 id.
 
 at § 33-387(b), and the failure to maintain a statutory agent for service,
 
 id.
 
 at § 33-387(c). Although the Connecticut statute provides that the dissolution shall be effective upon the filing of the certificate of dissolution by forfeiture,
 
 id.
 
 at § 33 — 387(d), it also provides that at any time within three years of dissolution a corporation may be reinstated,
 
 id.
 
 at § 33-388(a), and “the reinstated corporation shall be estopped to deny its corporate existence during such time as its rights and powers were forfeited,”
 
 id.
 
 at § 33-388(f). The statute further provides for winding up proceedings,
 
 id.
 
 at § 33-379, and ultimately for distributing the remainder of its assets among its shareholders after “a dissolved corporation has paid, satisfied and discharged or made adequate provision for all its liabilities and obligations”,
 
 id.
 
 at § 33-380(a).
 

 From the statutory scheme in Connecticut it is apparent, therefore, that there is no merit to Martin-Trigona’s claim that all the assets of New Haven Radio, Inc. immediately passed to him as sole stockholder when the corporation was dissolved by forfeiture in May of 1980. After the certificate of forfeiture was filed, the corporation was authorized either to seek reinstatement or to proceed with winding up its affairs. If it elected the latter course, proper provision had to be made for creditors, taxes, and other obligations. Rather than proceed with winding up the corporate affairs under state law, however, the debt- or sought the added protections of the federal bankruptcy code. Nothing in the Connecticut statute prohibits the corporation from electing that method of proceeding.
 

 To deny New Haven Radio, Inc. the benefits of reorganization or liquidation under the federal bankruptcy law would be contrary to the central purpose of the federal code. On the other hand, carrying out the liquidation of New Haven Radio, Inc. under the federal code is fully consistent with the plan and purpose of the Connecticut statute authorizing dissolution by forfeiture. In short, on this point, we hold that the filing by the Secretary of the State of a certificate of forfeiture which effected a dissolution of the debtor corporation on May 30,1980, did not deprive the bankruptcy court of jurisdiction over the voluntary
 
 *1343
 
 Chapter 11 reorganization proceeding filed in September 1980.
 

 Accordingly, all of appellant’s challenges to the jurisdiction of the bankruptcy court are rejected.
 

 B.
 
 Conflicts of Interest
 

 The debtor asserts that there are conflicts of interest in this litigation which disqualify both the district judge and the trustee from participating in the corporate bankruptcy proceedings. These claims, too, are without merit.
 

 1.
 
 The District Judge
 

 In a comprehensive opinion denying the various motions to recuse, Judge Cabranes detailed Martin-Trigona’s repeated attempts to have him recused, and he rejected any claim that his partiality could reasonably be questioned. 573 F.Supp. 1237. The circumstances claimed to disqualify Judge Cabranes are somewhat involved and focus upon John Krick of the law firm of Greenfield, Krick & Jacobs. When Nicholas Bua was appointed trustee of the estate in October 1980 he was represented by Krick. Bua’s appointment as trustee was terminated two months later, on December 8, 1980, and the following day, Nicholas Bua & Co. was paid out of the estate bank account for accounting services rendered to the estate. Because the payment had not been authorized by the court prior to disbursement, as required by 11 U.S.C. § 327(a), Bua & Co. was obligated to return any money received. Subsequently, however, Judge Shiff ratified the employment of Bua & Co. and permitted it to retain the money previously paid, as well as to file an administrative claim for the balance of compensation claimed to be due, some $2,119.82.
 

 Although Krick represented Bua in connection with that application for compensation, Krick has not represented Bua in any capacity since that time, and, through an affidavit filed with the court, Krick has stated that neither he nor his firm is owed any monies arising out of Bua’s appointment or activities as trustee for the estate, and that he waives any future claim to a fee based on his prior representation of Bua.
 

 The debtor contends that Krick’s representation of Bua required Judge Cabranes to disqualify himself because Krick’s firm, Greenfield, Krick & Jacobs, represents Judge Cabranes in a personal matter completely unrelated to the bankruptcy proceeding. The debtor argues that the firm “might be coming before the court for fees on its own behalf, for its services, and also on behalf of its clients.” In support of this contention, the debtor claims that Krick has sought “compensation for his client [Bua] as late as 1981, and that the application is still pending in 1984.” As noted above, however, while Krick did represent Bua & Co. in its prior fee application, he has discontinued representing Bua and Bua & Co. and he and his firm have also waived any claim to fees that might be owed as a result of the prior representation. Thus, there is no present conflict of interest.
 

 Moreover, the facts that Krick previously represented a former trustee of the estate and that his law firm represents the judge before whom the bankruptcy action is now pending in an unrelated personal matter do not warrant recusal, especially since Judge Cabranes’s involvement with the bankruptcy proceeding and the other Martin-Trigona litigations began after Krick had ceased to represent Bua.
 

 After reviewing the papers submitted to us, including the full record in this case and Judge Cabranes’s thorough opinion, we find no basis to question Judge Cabranes’s impartiality. Instead, we commend this able district judge for his patient, fair, even-handed handling of this difficult matter in the face of Martin-Trigona’s persistent, vituperative, and intemperate attacks on him.
 

 2.
 
 The Trustee
 

 Martin-Trigona also alleges a disqualifying conflict of interest on the part of Irving Perlmutter, the present attorney for the trustee. The basis for this claim is that
 
 *1344
 
 Perlmutter represents Shore Line Newspapers, a division of Capital Cities Communications, the estate’s largest creditor, in an unrelated defamation action pending in Connecticut Superior Court in New Haven. Since no evidence has been presented that Perlmutter’s representation of Shore Line creates any conflict that may affect his independent professional judgment on matters relevant to this litigation,
 
 see Model Code of Professional Responsibility
 
 Canon 5, we find no reason to disqualify Perl-mutter from representing the trustee.
 

 C.
 
 Denial of Martin-Trigona’s Request to Testify at the Hearing on the Sale of Assets
 

 The debtor also contends that the district court erred in not permitting Martin-Trigo-na to testify as to the value of the radio station’s assets at the hearings held in March and April 1984. The purpose of the hearings was to determine whether the modified contract of sale at the reduced price should be approved. In a generalized request made at the March 27, 1984 hearing counsel for the debtor asked to have Martin-Trigona testify on the issue of value. Among the reasons advanced was the claim that Martin-Trigona was the “owner” of the property of the radio station.
 

 Judge Cabranes rejected the request to have Martin-Trigona testify because (1) the corporation, not Martin-Trigona personally, was the “owner” of the assets of the radio station; (2) any residual interest Martin-Trigona had in the corporation had devolved upon the trustee of his personal bankruptcy; (3) he had not been properly qualified as an expert witness, pursuant to Fed.R.Evid. 702, on the subject of the station’s value; and (4) since he had not been involved in the day-to-day operations of the station for over two years, he was not competent to give opinion testimony as a lay witness under Fed.R.Evid. 701.
 

 The receipt of evidence by the trial court lies largely within its discretion, and an evidentiary ruling will ordinarily not be disturbed unless it was “manifestly erroneous”.
 
 Salem v. United States Lines Co.,
 
 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962);
 
 Fernandez v. Chios Shipping Co.,
 
 542 F.2d 145, 153 (2d Cir.1976). We agree with the debtor that ordinarily the owner of property is competent to testify to its value,
 
 see generally
 
 3 J. Wigmore,
 
 Evidence
 
 §§ 714 and 716 (Chadbourn rev. 1970);
 
 Robinson v. Watts Detective Agency,
 
 685 F.2d 729, 739 (1st Cir. 1982),
 
 cert. denied,
 
 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953, 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983);
 
 Kestenbaum v. Falstaff Brewing Corp.,
 
 514 F.2d 690, 698 (5th Cir.1975),
 
 cert. denied,
 
 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976), especially in eminent domain proceedings,
 
 see
 
 1 L. Orgel,
 
 Valuation Under the Law of Eminent Domain
 
 §§ 132-3 (2d ed. 1953); 5 P. Nichols,
 
 Nichols on Eminent Domain
 
 § 18.4[2] (rev. 3d ed. 1975).
 

 We also agree that Judge Ca-branes’s view of “ownership” was perhaps overly formalistic. While Martin-Trigona was not the legal owner of the property to be valued, in theory at least, he was the equitable owner to the unlikely extent that the sale might realize sufficient proceeds to provide a surplus after satisfying all claims in both the corporate and his personal bankruptcy proceedings. More than that, Martin-Trigona has demonstrated an active interest in the proceedings; he was the sole stockholder and president of the corporation; and he was the only person who objected to the proposed sale. All these factors argue in favor of receiving his testimony, and if ownership were the only test of admissibility, we might find error in exclusion of this additional testimony by Martin-Trigona. However, there were other factors to be considered.
 

 Already referred to were Martin-Trigo-na’s lack of established expertise and his disassociation from the operations of the radio station for more than two years. In addition were the long history of his obstructionist and dilatory tactics, his open abuse of the trial judge, his adamant refusal to cooperate in his personal bankruptcy proceeding by submitting to the statutory examination, and his incarceration for con
 
 *1345
 
 tempt. Finally, his proposed opinion testimony was patently exaggerated, had largely been placed on the record in the earlier value hearings, and was inconsistent with the hard evidence of the marketplace.
 

 Far from being “manifestly erroneous”, therefore, the district court’s decision whether to hear Martin-Trigona’s testimony under the circumstances as they were presented on March 27, 1984, was, at the worst, merely a close decision. We conclude that Judge Cabranes’s rejection of the testimony lay within the bounds of his discretion and therefore did not constitute error.
 

 Even if exclusion of the testimony were assumed to be erroneous, however, we can perceive no prejudice to the debtor or to Martin-Trigona that would require reversal of the order appealed from. Judge Cabranes had available to him the testimony that Martin-Trigona had given on the application for approval of the original sale, and it is clear that to a large degree the proposed additional testimony would have been repetitious and cumulative, since Martin-Trigona was still insisting in the face of overwhelming evidence to the contrary that the station’s assets were worth approximately $1,500,000. Moreover, given the large spread between the only available offer ($430,000) and the point where any equity would become available to the debtor (over $1,000,000), the likelihood of prejudice from any possible valuation error resulting from the absence of Martin-Trigona’s testimony is nil.
 

 D.
 
 Adequacy of the Appraisal
 

 Next, the debtor contends that the updated appraisal done by the Holt Corporation was “totally inadequate” and a “farce”, essentially because it ignored (1) a “comparable” sale of another radio station in the New Haven area; (2) an increase in WNHC’s ratings from 1980-82; (3) a pending increase in the station’s power; and (4) “potential value” of the station in the future.
 

 Preliminarily, the district court was entitled to view any objections by the debtor to the Holt appraisal in light of the fact that the debtor had informed the court that it would arrange for an independent appraisal to be done, but then without further explanation, failed to provide such an appraisal. Thus, even assuming,
 
 arguendo,
 
 that the Holt appraisal contained some deficiencies, as the matter was submitted to the trial court the appraisal was not controverted by any other expert witness, nor were its underlying facts in substantial dispute Moreover, the district court was entitled to view the debtor’s failure to produce such an appraisal, after explicitly promising to do so, as evidentiary support for the Holt appraisal, and to regard the debtor’s after-the-fact objections as suspect. In any event, the other evidence in the case strongly suggests that Holt accurately appraised the value of the station’s assets, and the objections raised by the debtor in its brief do not convince us otherwise.
 

 First, the debtor contends that the appraiser ignored evidence of sales of comparable AM stations in the New Haven area in the past two years. Yet, the appraiser testified that these sales were of combined AM-FM stations and that the value of an AM station in a combined AM-FM sale could not be ascertained without doing an independent appraisal of that specific property. The debtor made no effort to rebut this statement at the hearing, nor did it submit any independent appraisal of the so-called “comparable” AM stations. While it is frequently true that comparable sales provide the best evidence of market value,
 
 see United States v. 33.90 Acres,
 
 709 F.2d 1012, 1013-14 (5th Cir.1983), the debt- or, given numerous opportunities to do so, has failed to establish either that these particular sales were actually “comparable” or that they would otherwise accurately reflect the market value of WHNC.
 

 Next, the debtor asserts that a jump in the station’s ratings (from 1.9 in 1980 to 8.1 in 1982, but down to 5.0 in 1983) and a pending application to increase power should have boosted the value of the station, and that the failure of the appraiser to
 
 *1346
 
 take these factors into account “tainted” the appraisal. The appraiser testified at the hearing that both types of “increases” would lead to an increase in the station’s value only if they resulted in additional billings to the station. Since there was no evidence that the jump in ratings or the potential power increase had produced additional billings, they are not on this record reliable indicia of any rise in the station’s market value.
 

 Even if the appraisal were to be regarded as deficient, we cannot forget that the district court was faced with an intensely practical problem: whether the proposed sale to Wardoco should be approved. Opinion evidence aside, the record strongly establishes that despite the trustee’s diligent efforts to find a buyer for approximately three years, the Wardoco offer was the only realistic one available. No purchaser offered to pay more; neither the debtor nor Martin-Trigona had been able to produce a purchaser. For the district court, therefore, the choice appeared to be one of either approving the offer, which was consented to by all creditors and opposed only by Martin-Trigona, or continuing the proceeding with no indication of any better resolution of the bankruptcy proceeding appearing in the future.
 

 The lack of prejudice to the debtor and to Martin-Trigona is further underscored by the position Capital, the secured creditor, occupies in the proceedings. At the time of the hearing, administration claims were estimated at $100,000, priority claims at $60,-000, unsecured claims at $73,000, and a separate claim by the American Society for Composers, Authors and Publishers at $13,-000, representing a total of $246,000 for all claims and expenses other than Capital’s secured claim, which at the time of the hearing was approximately $625,000. War-doco is willing to pay $430,000, and in order to bring this matter to an end, Capital agreed not only to reduce its claim so as to accept approximately $184,000 instead of $625,000, but also to take $150,000 of that claim in note, rather than as cash. Even if we were to assume that through other efforts a purchaser could be obtained for the station who was willing to pay even double the Wardoco offer, Capital would still be entitled to receive all of the increase. Without evidence of any likelihood of the debtor’s realizing any equity after the liquidation, it is difficult to envision any prejudice to either the debtor corporation or to Martin-Trigona, its sole stockholder.
 

 In sum, Judge Cabranes’s finding of value was not clearly erroneous; his approval of the sale to Wardoco was a proper exercise of his discretion; there is no other purchaser on the horizon willing to pay as much, let alone more, for the assets of the debtor; and the only party conceivably harmed under the circumstances presented here is the secured creditor, Capital, which has consented to the sale.
 

 E.
 
 Other Objections
 

 The debtor corporation advances a number of other objections, none of which was raised before the court below. Although they are not properly before us, and although we find no merit in any of them, for the sake of completeness we will refer to them briefly.
 

 The debtor charges that Larry Wardlaw, the majority stockholder of Wardoco, is not financially capable of buying the radio station and is actually a “front man” for undisclosed purchasers. In support of this claim, the debtor cites a number of actions that are supposedly pending against Ward-law concerning some unpaid bills. Whatever the truth of these allegations, they are not relevant to our determination here. Wardoco has entered into a contract to purchase WNHC and has made a down payment on the purchase price. There is no reason to believe that it will not perform its part of the bargain. If for some reason Wardoco does default, the trustee will at that time be able to pursue whatever course of action he deems appropriate to see that the interests of the estate are protected.
 

 Second, the debtor corporation contends that the radio station’s manager, as a
 
 *1347
 
 result of her five-percent interest in the buyer corporation, had a “direct motive to reduce earnings to cut the price” that will be paid for the station, and that she reduced the profits of the station by expanding the payroll. At the hearing before Judge Cabranes both the parties and the court were fully aware of the station manager's interest in the radio station, and counsel for the debtor cross-examined the station manager about it. In addition, the station manager testified that all of its revenue was turned over to the trustee, who also signed all the checks issued by the station to pay for expenditures, and that together, they reviewed in detail all of the station’s expenditures before any checks were signed. These facts satisfy us that there has been no “fraud” perpetrated on the court or the debtor and, in the absence of any countervailing evidence in the record, that the station manager did nothing to depress the station’s earnings, nor could she, considering the close supervision over the station’s expenditures exercised by the trustee.
 

 The final claim, that various actions of Judge Cabranes denied the debtor “the effective assistance of retained counsel” at the hearing, similarly lacks merit. Counsel ably represented the corporation’s interests at the hearing, and the record demonstrates that the district judge in no way hampered the vigorous advocacy of counsel on behalf of his client. Moreover, although Judge Cabranes did not allow Martin-Trigona to be present in the courtroom during the hearing — instead he remained in the marshall’s office some 100 feet away, in confinement pursuant to the civil contempt — the judge did allow frequent consultations between debtor’s counsel and Martin-Trigona, even though Martin-Trigona was not the client here. Considering the past history of this litigation, Martin-Trigona’s penchant for disruptive tactics in court, and the fact that Martin-Trigona was in contempt of court for refusing to testify on his personal bankruptcy proceedings, it was within Judge Ca-branes’s discretion to exclude him from the proceeding to evaluate the proposed sale of the radio station.
 

 Conclusion
 

 The order of the district court is therefore affirmed, and the mandate shall issue forthwith.