**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Juan DeLEON et al., Defendants-
Appellants.**

**Nos. 73–1609, 73–1610 and 73–2049.**

United States Court of Appeals,
Seventh Circuit.

Heard March 1, 1974.

Decided June 25, 1974.

Rehearing En Banc in No. 73–1609
Denied July 31, 1974.

Rehearing En Banc No. 73–1610
Denied July 18, 1974.

Francis E. Andrew, Jackson H. Welch, Cornelius E. Toole, Allan A. Ackerman, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Walter Jones, Jr., Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, CUMMINGS, and PELL, Circuit Judges.

CUMMINGS, Circuit Judge.

The three defendants, Wilton Torres, Juan DeLeon, and Gloria Diaz, were indicted with two others,[1] for possessing with intent to distribute and distributing cocaine and for a conspiracy to do so, in violation of 21 U.S.C. §§ 841(a)(1) and 846. After a jury trial, these defendants were convicted on both counts. Torres and DeLeon received five-year sentences and Diaz was sentenced to five years under the provisions of 18 U.S.C. § 4208(b).

Viewed most favorably to the Government, the evidence at trial showed that Steve Campbell, a special employee of the Bureau of Narcotics and Dangerous Drugs ("Bureau") told Francis Tucci, an agent of the Bureau, that if he met Holzinger, Tucci would be able to purchase a pound of cocaine. Accordingly, Tucci visited Holzinger on August 23. Holzinger thought that Tucci was a partner in a cocaine operation. Tucci was told by Holzinger that he was making arrangements to meet Torres the next day to procure a pound of cocaine.

On August 24, Tucci accompanied Holzinger to the residence of Wilton Torres, described by Holzinger as his supplier. Upon inquiry, Torres told Tucci that after Torres received a phone call he would sell Tucci a pound of cocaine for $10,000. Torres then told Tucci that he was going to meet "with his people" and it would be best for Tucci to return at 6:00 p. m. to complete the deal. Tucci agreed to return to the Torres apartment later.

At the 6:00 p. m. rendezvous, Torres told Holzinger that they would have to see a couple of people about procuring the pound of cocaine. They went to see Juan DeLeon and found him outside his home in his car. Holzinger was told by Torres that he was going to talk to his connection, and Torres and DeLeon then disappeared into the latter's home.

Soon afterwards, Torres and DeLeon returned outside and walked toward Torres' auto. Torres told Holzinger they would not be able to obtain a pound of cocaine but possibly could obtain two ounces. Holzinger then called Tucci at Torres' apartment to see if Tucci was

---

1. Defendant Allen Holzinger pled guilty before trial, testified as a government witness and received three years' probation. Defendant Manuel Torres was a fugitive when these defendants were tried. He was recaptured, and his trial was scheduled for March 19, 1974.

willing to purchase two ounces. Diaz answered Torres' phone and Holzinger asked to speak to Tucci. Diaz gave Tucci the phone and Holzinger told him he could not obtain the pound of cocaine but had a couple of ounces to sell. Tucci told both Holzinger and Torres that he would wait until a pound became available.

On September 8, Tucci telephoned Holzinger. Holzinger said that Wilton Torres was ready to sell Tucci a pound of cocaine. Tucci and Holzinger met that afternoon and drove to Torres' apartment, where Diaz and Torres were present. Torres asked Tucci if he was ready to buy the cocaine and received an affirmative reply, and Tucci was again told by Torres that the price would be $10,000 a pound. Torres gave Tucci a small sample of the cocaine and told him to return at six o'clock to consummate the deal. As Tucci was leaving Torres' apartment, Diaz said she was certain the deal would go through and that Tucci was not a policeman. When Tucci returned to Torres' apartment at 6:00 p. m., Diaz told him that Holzinger and Torres had left. Torres later called Tucci at Torres' apartment. Torres told Tucci that he could not settle the deal until 9:00 p. m., and Tucci then backed out, apparently because of the delay.

On September 14, Tucci called Holzinger about the purchase of the pound of cocaine from Wilton Torres. Holzinger replied that final arrangements had been made for the sale. Therefore, on the following day, Tucci met in his car with Holzinger and went to a Chicago intersection around noon. Holzinger left the car and walked out of view for five minutes. When Holzinger returned, both stood by the car for a few minutes until Diaz came and escorted them into a basement apartment at 1434 North Ashland Avenue in Chicago.

In the apartment, Wilton Torres asked Tucci if he had the money and told Tucci the cocaine was due shortly. Soon thereafter, DeLeon and Manuel Torres entered the apartment. The Torreses and DeLeon left the living-room and DeLeon handed a package to Wilton Torres in the kitchen. Wilton Torres then walked into the living-room and handed Tucci a small package containing some white powder, stating that it was a sample of the pound he was prepared to sell Tucci. Wilton Torres then asked Tucci to go outside and obtain the money and bring it inside. Tucci said that he would not bring the money inside the apartment because the large number of people inside the apartment might rob him. Diaz assured Tucci that they were not going to rip him off, that they only intended to sell him cocaine. DeLeon insisted that the sale be conducted inside the apartment to reduce the chance of arrest. Tucci threatened to leave if the deal were not conducted outside. Wilton Torres then stated that if the deal were conducted outside, Holzinger would have to remain inside as a hostage with Manuel Torres. DeLeon agreed to this proposal. Tucci, DeLeon and Wilton Torres then left the apartment while Diaz remained inside with Holzinger and Manuel Torres.

Tucci accompanied Wilton Torres to his car where they stood until they were approached by DeLeon and one Thomas Nieves, a non-defendant.[2] Nieves handed a blue bag to Torres, who extracted a clear plastic bag therefrom and stated to Tucci "Here is the cocaine, where is my money?" Tucci then took the cocaine and signaled other agents of the Bureau and announced that defendants were under arrest. DeLeon and Nieves started to run away but were caught and arrested. Wilton Torres and the three who remained in the apartment were also arrested.

 Defendant Diaz first contends that a mistrial was necessary because of the district judge's remarks when she failed to appear at the afternoon session on the second day of the trial. Her

2. Agent Tucci testified that Nieves was not indicted because he played only a minor part in the conspiracy.

counsel explained to the court that he did not know Diaz' whereabouts and speculated that her absence might be because of her roommate's pregnancy. The court then announced in the jury's absence: "We will go forward with the trial. I will tell the jury that Miss Diaz has been unavoidably detained and has waived her privilege to be here and the trial will continue." Counsel for Diaz then stated, "All right, your Honor." Then he made an oral motion for a mistrial and severance. The motion was promptly denied and the court stated it hoped that Diaz would be present on the following day.

After government counsel pointed out that Diaz had been an hour late on the initial trial date and was presently four hours late on the second day of the trial, he requested that a bench warrant issue and that her bond be forfeited. The court agreed that a bench warrant should issue and said that it would deal with the bond forfeiture at a later time. The jury was then brought in and the court stated:

> "Miss Gloria Diaz, one of the defendants, is unable to be present and has waived her right to be present for this session and we will go ahead and proceed in her absence."

Her counsel now states that the district judge erroneously declared that Diaz had waived her right to be present. However, he failed to object when the judge first stated that he would make such a statement and again failed to object when the statement was made to the jurors. We cannot agree with defense counsel that the judge's statements had the effect of "planting the seed of prejudice in the minds of the jurors," on the theory that the statement that she waived her rights was inconsistent with the statement that she was unable to be present. The two statements were not necessarily inconsistent, and even if they were in some technical sense, we doubt that the jury understood them in that sense. As noted even by Diaz' counsel, Rule 43 of the Federal Rules of Criminal Procedure provides that in prosecutions for non-capital offenses a "defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict." As her counsel's brief states, "the defendant's voluntary absence constitutes an effective waiver of his right to be present * * *." Diaz' pregnancy certainly does not show that her sudden absence from trial was involuntary; her roommate's pregnancy shows even less. No other reason for her absence has been advanced. She remained a fugitive until being arrested on a bench warrant on September 20, 1973, some 4½ months later, thus buttressing the trial judge's conclusion that she willingly remained away from the trial. At least in the absence of any request by her counsel for a hearing as to the reason for her absence, we agree that the trial judge's statement to the jury was appropriate and nonprejudicial. In fact, his statement gave her the benefit of every possible doubt to avoid prejudice.

■ Diaz' counsel contends that since there was no evidence of her flight and since her absence was not voluntary, the trial court improperly instructed the jury that flight is a circumstance which may tend to prove consciousness of guilt and should be considered and weighed in connection with all the other evidence. If the jury viewed her absence as her counsel does—and the only explanation of her absence to the jury was the judge's statement that she was "unable" to be present—then it understood the instruction as applying only to DeLeon, who fled at the initial arrest. This was apparently the trial judge's intention; he refused to instruct that Diaz had been absent without his permission. Even if the jury understood the flight instruction as applying to Diaz' absence from trial, there was no prejudice since her own counsel did not know her whereabouts, and no plausible excuse for her absence has been offered.

■ DeLeon and Torres also attack the flight instruction. As noted, the flight instruction was singularly appro-

priate as to DeLeon. Since the jury had been advised by Agent Tucci that Wilton Torres did not attempt to escape arrest, the instruction did not apply to him. At least in the absence of a request, it was unnecessary for the district judge to specify that the flight instruction applied only to DeLeon.

DeLeon and Torres also argue that Diaz' flight from trial was imputed to them by the standard instruction that the acts of one conspirator "in furtherance of the conspiracy and during its existence" may be considered against co-conspirators. It appears that defendants did not request a clarifying instruction that the conspiracy had terminated before trial, so that they cannot complain now. We doubt that the jury misunderstood, particularly since in the instruction on statements of coconspirators, the judge specifically mentioned that statements after the termination of the conspiracy were evidence only against the person making them.

Diaz' final argument is that there was insufficient evidence to support her conviction. Again we disagree. She appears to concede that a conspiracy was established, and the evidence summarized above was ample to connect her with the conspiracy to sell a pound of cocaine to Tucci. Her service as a functionary of the scheme was also sufficient to support her conviction on the substantive count, for she led Tucci to the place of sale, previously unknown to him; she assured both sides that they would not be betrayed by the other, stating that defendants only wanted to sell cocaine. She was present at the prior negotiations and unsuccessful attempts to complete the sale, where her cautious co-defendants were unlikely to have admitted non-conspirators. Her participation was adequately established. Cf. United States v. Pentado, 463 F.2d 355, 362–363 (5th Cir. 1972), certiorari denied sub nom. Noa v. United States, 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 271.

All defendants complain that their cross-examinations of Tucci and Holzinger were unduly restricted. They argue that they should have been permitted to explore further Holzinger's involvement as a broker in the sale of one hundred pounds of marijuana on August 23. Holzinger had not been prosecuted for this sale. Defendants concede that the sale was not admissible to show Holzinger's general lack of credibility (the character theory). See Michelson v. United States, 335 U.S. 469, 482, 69 S. Ct. 213, 93 L.Ed. 168; United States v. Banks, 475 F.2d 1367 (5th Cir. 1973). However, they argue that the sale was admissible to show that Holzinger might falsely testify favorably to the Government from fear of prosecution (the bias theory).

Previous attempts to deal with the tension between the admissibility of evidence supporting the bias theory and the inadmissibility of the same evidence to support the character theory relied heavily on the fact that the witness was substantially impeached by other means. See United States v. Amabile, 395 F.2d 47, 50–51 (7th Cir. 1968), reversed on other grounds, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297, reimposed convictions affirmed, 432 F.2d 1115 (7th Cir. 1970), certiorari denied, 401 U.S. 924, 91 S.Ct. 869, 27 L.Ed.2d 828; United States v. Conrad, 448 F.2d 271, 274 (9th Cir. 1971). Similarly, here, the jury was informed of many other factors bearing adversely on Holzinger's credibility. However, we need not rely on other impeachment. We think the district judge found a general solution to the conflict between the two principles involved here.

The matter first arose on DeLeon's cross-examination of Tucci. He was permitted to testify that through Holzinger he had obtained some of the hundred pounds of marijuana. Such a showing that at the time of the direct testimony the Government knew of the alleged criminal act is essential to admissibility under the bias theory; if a witness' general fear that he might be caught and prosecuted were sufficient to show bias, then the rule that past criminal conduct not resulting in conviction is

inadmissible would never apply to government witnesses. Judge McLaren then refused to permit further inquiry into the circumstances surrounding the sale. The matter next arose at a conference the following morning, and Judge McLaren ruled as follows:

"THE COURT: It's already established there is something to do with a hundred pounds of marijuana. I will allow you to go into that in a very limited way. That is to say, there has been no prosecution, no case brought on that, and I will let you inquire as to whether any promises have been made; beyond that, I am not going to go on a whole other trial."

This was correct, for the crime, the government's knowledge, the lack of prosecution, and any promises are relevant to the bias theory. Whether Holzinger feared prosecution would also be relevant. Other surrounding circumstances would go only to the inadmissible character theory. However, defendants apparently failed to grasp the implications of the distinction they urged. When counsel for Torres raised the marijuana sale on cross-examination of Holzinger, he immediately began inquiry into surrounding circumstances. When objections were sustained, he went on to another subject, never asking about promises or lack of prosecution. DeLeon's counsel did not raise the matter until re-cross-examination and then conceded it was outside the scope of re-cross. Diaz has adopted this argument by incorporating the briefs of DeLeon and Torres; she does not indicate that her counsel ever asked about the marijuana sale. Judge McLaren's rulings were correct and explicit; defendants simply failed to ask the right questions.

Torres complains that he was denied due process by the absence of an interpreter during the beginning of his cross-examination. However, his trial counsel had considered Torres to be sufficiently adept in English to proceed without an interpreter through direct examination and most of cross-examination. Then an interpreter was provided immediately when requested by counsel. Holzinger testified that Torres spoke English fluently, and all Tucci's negotiations with Torres were conducted in English. In these circumstances, the argument is purely frivolous.

Torres also asserts that the trial court erroneously permitted evidence of his prior criminal acts. Here Torres had raised the defense of entrapment so that evidence of prior acts was admissible to show his disposition to commit the offense. United States v. Simons, 374 F.2d 993, 995 (7th Cir. 1966); United States v. Brown, 453 F. 2d 101, 108 (8th Cir. 1971). Since this defendant specifically denied selling cocaine or heroin prior to August 23, 1972, it was permissible for the Government to rebut his testimony by Special Agent Patterson's testimony that Torres had sold him cocaine on April 4, 1972. Although Torres now urges that the court should have given an instruction as to how the jury should treat his April 4, 1972, sale, his own counsel objected to such an instruction that had been proffered by the Government and was agreeable to the court. Torres argues here that the Government instruction was incorrect, but the trial judge was never advised that the instruction would be acceptable if modified, and no substitute was tendered. Because all defendants' counsel had objected, the instruction was not given. This invited error cannot be raised now.

Finally, we conclude that no reversible error occurred with respect to the destruction of Agent Tucci's original handwritten notes. At the September 26, 1972, preliminary hearing before the magistrate, at the request of the defense counsel, the magistrate ordered Tucci to produce his handwritten notes which were in the process of transcription. After the recess, the Government moved to dismiss the complaint and defendants were not indicted until December 19, 1972.

At the trial, defense counsel were permitted to cross-examine Tucci about his investigative notes. He had incorporat-

**1334**

ed these notes into a handwritten memorandum submitted for typing. He testified that at the preliminary hearing before the magistrate the references were to that handwritten memorandum rather than the original handwritten notes. Both the original handwritten notes and the handwritten memorandum were destroyed prior to trial. He testified that the handwritten memorandum was destroyed after the preliminary hearing, and that he was not sure about the timing of the destruction of the original notes. The final report generated from the notes was made available to the defense counsel under the Jencks Act.

 It was indefensible for Agent Tucci to destroy his handwritten memorandum after the magistrate's order to produce it. The Government has a remedy in mandamus for premature orders to disclose Jencks Act material. United States v. McMillen, 489 F.2d 229 (7th Cir. 1972). Instead, to end the magistrate's power to act by destroying the subject matter of the litigation is contemptuous. Griffin v. County School Board, 363 F.2d 206 (4th Cir. en banc 1966). It is of course well settled that contempt of an erroneous order is still contempt. United States v. Seale, 461 F.2d 345, 361 (7th Cir. 1972), collecting cases.

██ The Government's response that Agent Tucci routinely destroyed his notes in accordance with long-established practice strains credulity here. It is scarcely "routine" to destroy notes after an order to produce them. The Government knew that defendants wanted these notes and that a judicial officer had found their production necessary. Although the Government contended that the magistrate lacked power to order their production at that time, it knew that under 18 U.S.C. § 3500 that objection would vanish once Agent Tucci had testified at trial. See United States v. Bell, 457 F.2d 1231, 1235 (5th Cir. 1972). Under these circumstances the Government had an obligation to preserve the notes, and their destruction must be deemed in bad faith. See Campbell v. United States, 303 F.2d 747,

751 (1st Cir. 1962), vacated on other grounds, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501, Comment, "Judicial Response to Governmental Loss or Destruction of Evidence," 39 U.Chi.L.Rev. 542, 548–552 (1972).

The remaining issue is whether defendants should benefit from the Government's misconduct. United States v. Quinn, 357 F.Supp. 1348 (N.D.Ga.1973), although involving similar facts, is not in point because defendant there sought to quash the indictment. Here defendants sought to impeach Agent Tucci by showing the circumstances under which he destroyed the notes. By his relevancy ruling, the trial judge must have concluded that the Government destroyed the notes because of its refusal to deviate from custom, rather than to avoid producing evidence damaging to its case. Therefore, Killian v. United States, 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256, does not require a remand. United States v. Lonardo, 350 F.2d 523 (6th Cir. 1965) limited its holding to stenographic transcripts of a witness' statement; to the extent that the language of that case is contrary to our holding here, we disagree.

Judgments affirmed.