UNITED STATES of America,
Plaintiff-Appellee,

v.

Sam R. ROVETUSO, Tommy Hendrix
and Juan Williams,
Defendants-Appellants.

Nos. 83–3302, 83–3303 and 84–1174.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 4, 1984.

Decided July 16, 1985.

Rehearing and Rehearing In Banc
Denied Sept. 11, 1985.

As Amended Sept. 27, 1985.

Andrea L. Davis, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Kenneth N. Flaxman, Eileen Kavanagh, Judith A. Halprin, Chicago, Ill., for defendants-appellants.

Before CUDAHY, COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

In 1983, the defendants-appellants, Sam R. Rovetuso, Tommy Hendrix, and Juan Williams, were indicted for and convicted of attempting to interfere with the testimony of a government witness in violation of 18 U.S.C. § 1512 (Count I). They were also convicted of obstructing justice under 18 U.S.C. § 1503 (Count II) and conspiring to intimidate a witness (Count IV). They appeal their convictions raising a number of allegedly prejudicial evidentiary rulings and challenging the sufficiency of the evidence. We affirm.

## I.

The parties stipulated at the defendants' trial that from January 1980 through July 1983, the defendant, Sam Rovetuso, was the target of two Federal Grand Jury investigations. The first investigation concerned Rovetuso's company, National Investigations Bureau ("NIB"), which provided security guards to various government entities and private businesses. In 1979, NIB entered into a contract with the City of Chicago, funded by the Department of Housing and Urban Development, to provide security guards for the City. In January of 1980, a Federal Grand Jury began an investigation to determine if the company had submitted false and fraudulent billings. On February 20, 1980, Rovetuso appeared before the Grand Jury and was informed that he was the subject of the investigation. Shortly thereafter, Rovetuso also became the subject of a second investigation involving a bankruptcy fraud;

allegedly, he had agreed to help the owners of an advertising agency launder the agency's assets prior to its filing for bankruptcy.

The Grand Jury investigating the NIB fraud indicted three NIB employees, including Allen Gilman, in July of 1982. Prior to their trial in March of 1983, Allen Gilman plead guilty and agreed to testify against the other indicted NIB employees. He testified at the trial of these employees on March 29, 1983. Gilman's testimony at this trial was extremely damaging to Rovetuso as it indicated that Rovetuso had ordered his employees to falsify time records submitted to the City of Chicago and to destroy documents subpoenaed by the Grand Jury. In July 1983, Gilman repeated this testimony before the Grand Jury investigating Rovetuso's participation in the NIB fraud and also testified in May 1983 before the Grand Jury investigating the bankruptcy fraud. Based upon Gilman's testimony, Rovetuso was indicted for bankruptcy fraud in June of 1983 and for the NIB fraud in July of 1983.

It was the government's contention at trial that Sam Rovetuso, along with his brother, Tommy Hendrix,[1] and a friend and part-time employee, E. Juan Williams, arranged for the murder of Allen Gilman by a contract killer. The person whom they approached to do the killing was Gilberto Oliveros, an FBI informant, working primarily in drug investigations. The government's evidence at trial consisted of tape recordings which Oliveros had secretly made of conversations he had with the defendants, along with his testimony as to the conversations between himself and the defendants.

The evidence at trial demonstrated that on April 14, 1983, Williams, an instructor at the school for training security guards, told Oliveros, a student at the school, that certain "Italians" he worked for wanted Oliveros to kill a witness who was cooperating

---

1. Tommy Hendrix is Sam Rovetuso's brother; Rovetuso had earlier changed his name from Hendrix to Rovetuso.

with the Federal government. Oliveros had attracted Williams' interest by telling him that he had worked for the Panamanian police, that he had been a secret agent for the Panamanian government and that he had previously served a 12-year prison term in Panama for killing several persons.

In a meeting that was tape recorded on April 19, 1983, Williams told Oliveros that he would receive $2,000 for killing a witness. He also told Oliveros that the witness had testified against two men who were previously convicted and sentenced to confinement. In another meeting on May 9, 1983, not recorded on tape, Williams confirmed the $2,000 fee and also stated that the "Italians" would ask Oliveros to prove his sincerity by traveling to Texas to bring back a woman who had deserted her husband. On May 10, 1983, Oliveros met with Rovetuso and Hendrix for the first time, along with Williams, at Rovetuso's home to discuss the plans for Gilman's murder. Rovetuso told Oliveros that the witness he wanted killed was cooperating with the Federal government, that Oliveros would receive $2,000 for killing the witness, and that he did not care how the witness was murdered, but the body was to be moved from Illinois to Mexico to hamper its discovery.

On May 12, 1983, Oliveros again met with the three defendants at Rovetuso's home. The discussions in the house were not taped because Oliveros left the recording device in the car since he feared that he might be searched by the defendants and the taperecorder discovered. Oliveros testified that during the meeting in the house, Rovetuso handed a piece of paper to Williams containing the license plate number, description of the witness's car as well as the address of the witness's mother. Oliveros was also instructed that he would be taken to the witness's place of employment either by Williams or another man. Also, during the May 12 meeting Rovetuso mentioned to Oliveros for the first time his interest in having Oliveros arrange for the purchase of several kilos of cocaine. Oliveros agreed to attempt to organize a cocaine deal. After Oliveros and Williams left Rovetuso's house and climbed into Oliveros' car, Williams handed the piece of paper to Oliveros and allowed him to transfer the information regarding the intended victim onto another card.[2] This transfer of information was recorded by the taperecorder in the car.

Oliveros again met with the defendants on May 13 and the killing of the witness was discussed. It was decided that Oliveros would accompany Williams to visit the night club where Gilman was employed in order that Williams might point out Gilman to Oliveros. When Williams failed to appear that evening, Oliveros went to the club alone.

In a taped conversation that took place on May 16, 1983, Oliveros was told by Hendrix that they had decided to alter the murder plan to make it look like a robbery. According to the new plan Gilman was to be killed, his jewelry and money taken, and the body left in a bad neighborhood. The three defendants also discussed the method of how Oliveros was to obtain a gun and the approximate date of the murder, and it was on this occasion Hendrix informed Oliveros that the intended victim was Allen Gilman. The defendants also suggested that they might hire Oliveros to kill Michael Velez, a man who had allegedly killed a brother of one of the defendant's friends. The price for this murder was also to be $2,000.[3]

At the May 16 meeting the cocaine deal was again brought up and Oliveros was told to return with a sample. When Oliveros next met with the defendants on the following day, May 17, he did not have the requested cocaine sample. Oliveros' inability to procure the cocaine as promised

2. Williams was arrested on an unrelated charge on May 21, 1983; the original piece of paper which contained the information relating to Gilman was found in his possession at the time of his arrest.

3. Michael Velez testified at trial and matched the description of Michael Velez given to Oliveros by the defendants.

aroused the suspicion of the defendants that he was a government informant.[4] Their suspicion was heightened when Hendrix spotted an FBI surveillance car parked outside the house on May 16 and traced its license plate number to the Federal government. On May 17, as Oliveros entered an unmarked FBI car after his meeting with the defendants, his activated taperecorder emitted a loud noise which apparently was caused by interference with the radio in the FBI car. On May 19, Juan Williams informed Oliveros that the cocaine deal was off because of his failure to deliver the cocaine sample and because of their suspicion that he was involved with the FBI.[5] Shortly thereafter, on May 26, 1983, all three defendants were arrested on the charges contained in this indictment.

The defendants raise numerous grounds for reversal contending, among other things, that: the district court improperly limited the cross-examination of the government's chief witness, Gilberto Oliveros, and made other erroneous evidentiary rulings during the course of the trial; the evidence was insufficient to demonstrate any attempt to kill Allen Gilman; 18 U.S.C. § 1503 allegedly no longer covers witness tampering; and Juan Williams was incompetent to stand trial.

## II.

On direct examination, Gilberto Oliveros, the government's key witness, revealed that he was a Panamanian citizen residing in Chicago, Illinois as an illegal alien. On cross-examination, Oliveros claimed that when he was in Panama he was employed as a Panamanian intelligence officer. On appeal, the defendants argue that the district court improperly limited cross-examination of Oliveros when it prohibited examination of Oliveros as to his means of support while in Panama between the ages of

12 and 15, the specifics of his activities while working as a Panamanian secret agent, and the reason for his conviction for an alleged twelve-year jail sentence in Panama. They also contend that the district court improperly excluded extrinsic evidence of Oliveros' background. The district court, when ruling on the objection concerning this evidence, relied on Fed.R. Evid. Rule 401 and Rule 608(b) which provides:

> "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness...."

A district court has broad authority to control the admission of evidence and the scope of cross-examination, *see, e.g., United States v. Xheka*, 704 F.2d 974, 984 (7th Cir.1983); *United States v. Werbrouck*, 589 F.2d 273, 278 (7th Cir.1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979), that will not be disturbed on appeal unless an abuse of discretion is shown. *See, e.g., United States v. Solomon, et al.*, 686 F.2d 863, 874 (11th Cir.1982).

The defendants' claim that they were denied an effective cross-examination of Oliveros when the district court sustained objections to questions concerning Oliveros' background. However, the objections to these questions dealing with matters such as Oliveros' means of support between the ages of 12 and 15 were completely irrelevant and thus properly sustained by the district court under Fed.R.

---

**4.** During this meeting Rovetuso expressed his frustration at Oliveros' inability to obtain the cocaine and he told Oliveros that Gilman would be murdered only when he (Rovetuso) told Oliveros to do so. Rovetuso also questioned Oliveros about the details of his surveillance of Gilman.

**5.** During this conversation, Williams told Oliveros that Rovetuso "wants to get the matter straightened out with the cocaine, and if you can do that, you know. Just as a matter of proving yourself to him."

Evid. Rules 401 and 608(b).[6] The defendants also claim that the district court erred when it allowed Oliveros to claim his "Panamanian secrecy oath" to avoid answering questions about his background. Even though Oliveros refused to answer specific questions concerning his anti-terrorist activities in Panama, no contemporaneous objection was made to his refusal to answer the question and further the defendants failed to request that the court compel Oliveros to answer.[7] When a later attempt was made by defense counsel through cross-examination to establish that Oliveros had decided to give precedence to his Panamanian oath of secrecy over the oath he had taken at trial, the district court allowed cross-examination on that point. At the same time, the district court judge made it clear that many of the questions concerning the specifics of Oliveros' activities as a Panamanian security agent were irrelevant (Tr. 1306–1309). After reviewing the record in this case, we hold that the district court did not abuse its discretion in sustaining objections to the detailed questions inquiring into Oliveros' background.

■ The defendants further claim that the district court improperly limited cross-examination as to questions concerning the twelve-year sentence Oliveros received in Panama. Our examination of the record reveals that this argument is meritless since the district court did not limit inquiry into the details of his conviction. Oliveros not only later testified that his conviction had been for "murdering some people" but he later conceded on cross-examination that his entire conviction was a fabrication. After reviewing the entire record in this case and the fact that the defendants cross-examined Oliveros for more than five days during the trial, we hold that the defendants most certainly were not deprived of their right to an effective and complete cross-examination of Gilberto Oliveros on this point.

The defendants also argue that the district court erred when it excluded extrinsic evidence of Oliveros' criminal record in Panama, which included an alleged fraud conviction in 1977, an assault complaint from 1980, and a bank robbery arrest warrant from 1981. They also sought to introduce extrinsic evidence that Oliveros was not a Panamanian secret agent. On the twelfth day of trial, the defendants brought this evidence to the attention of the district court and sought a continuance of the trial; however, the court denied this continuance. The judge found that the evidence of the Panamanian conviction was not admissible under Fed.R.Evid. Rule 609 because it had been obtained without affording the defendants the assistance of counsel and, hence, the conviction did not meet the requisite due process requirements to support admission as impeach-

6. Williams' attorney sought to raise on several occasions the details surrounding Oliveros' activities as a Panamanian agent; however, the district court sustained the objections to these questions on the grounds that the details sought were irrelevant to the case. Williams' attorney argues that the district court sustained the objections on the basis that Oliveros did not have to answer because of a supposed "Panamanian secrecy interest." However, the reason why the district court sustained the objections to questions such as the nature of his security job in Israel, where Oliveros had lived besides Panama, and the schools that he attended was that these questions were irrelevant. At no time during this series of questions did defense counsel ever argue that she was attempting to lay a foundation to establish any sort of bias on the part of Oliveros in testifying. Rather, the only time that the bias issue was brought to the attention of the district court was when the defense counsel attempted to question Oliveros

about this alleged conviction and twelve-year sentence in Panama. In that instance the district court did allow defense counsel to cross-examine Oliveros.

7. Defense counsel cross-examined Oliveros as follows:
Q. "You say you cannot answer? Are you sworn to some form of secrecy?
A. "Right.
Q. "And it would be violative of your oath to the country of Panama to reveal this?
A. "Talking about this sir, I have to mention names and dates, and I cannot do that.
Q. "So, there are some things you can't tell us today, is that right?
A. "Right.
Q. "Now, when you left Panama did you leave in a hurry?
＊　＊　＊　＊　＊　＊

ment evidence. (Tr. 2128–30). *United States v. Wilson,* 556 F.2d 1177, 1178 (4th Cir.) (per curiam), *cert. denied,* 434 U.S. 986, 98 S.Ct. 614, 54 L.Ed.2d 481 (1977); *cf. United States v. Manafzadeh,* 592 F.2d 81, 90 (2nd Cir.1979). The court further found that the other evidence concerned only collateral matters and thus was not admissible. On appeal, the defendants do not contend that this conviction should have been admitted under Rule 609, rather they contend that all of the extrinsic evidence which they sought to introduce would have demonstrated Oliveros' bias in testifying because of his alleged fear of a returning to Panama to face these charges.

■ During the entire time that defense counsel and the prosecutor debated the admissibility of this evidence, the defendants never even raised the ground of bias and motive as a basis for admissibility. Instead, they argued that if the evidence was not admissible under Fed.R.Evid. Rule 608(b) it was admissible under Rule 613. Failure of the defendants to raise the issue of bias and motive at trial constitutes waiver of that issue on appeal. *See United States v. Carter,* 720 F.2d 941, 945 (7th Cir.1983); *Huff v. White Motor Corp.,* 609 F.2d 286, 290 n. 2 (7th Cir.1979). The defendants argue in a circular fashion that they did bring to the attention of the district court that Oliveros had a motive to lie since he feared deportation as he was in this country as an illegal alien. Our examination of the record, however, reveals that the defendants raised the issue of bias briefly during a colloquy with the court concerning an entirely different evidentiary issue almost one week prior to the time that they sought introduction of the extrin-

sic evidence, but did not raise bias or motive as grounds for admissibility when they sought to introduce the extrinsic evidence. Further, even if defendants did not waive this argument, defense counsel never laid the requisite foundation to admit this extrinsic evidence. In *United States v. West,* 670 F.2d 675, 683 (7th Cir.), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982) (*citing United States v. DeLeon,* 498 F.2d 1327, 1333 (7th Cir.1974)), we stated that before counsel could question the witness as to prior bad acts to establish bias and motive, the examiner must initially establish (1) the bad act; (2) the government's knowledge of the act; (3) the lack of any prosecution; and (4) the existence of a promise not to prosecute. The record in this case fails to demonstrate that the prosecution had any prior knowledge of Oliveros' Panamanian alleged criminal activities or that there existed any promise not to extradite Oliveros for the alleged crimes.[8]

■ As to the testimony of a private investigator who would have testified, if allowed, that Oliveros was never a Panamanian police officer, it is clear that this testimony was excluded as improper impeachment. The rule in this circuit is that a witness "may not be impeached by contradiction as to collateral matters elicited on cross-examination." *United States v. Taylor,* 728 F.2d 864, 874 (7th Cir.1984); *see also Carter,* 720 F.2d at 949. In this case, it was the defendants who asked Oliveros on cross-examination whether or not he was a Panamanian police officer; thus, their attempt to impeach him by contra-

---

**8.** The defendants point only to a brief exchange early on during Oliveros' testimony on direct examination when the prosecutor asked Oliveros whether the FBI had "done anything in regard to [his] status" and Oliveros replied that the FBI told him they would "fix whatever happens." It had been already established that Oliveros was an illegal alien working as a paid informant on drug cases; thus, this brief exchange falls far short of establishing that the prosecutor in this case knew of any alleged deal. Further, defense counsel had more than ample opportunity to delve into this area when Olive-

ros was on the stand for cross-examination for three days; however, the defense never chose to do so. Finally, defense counsel did argue, and the jury was sufficiently appraised of, Oliveros' bias during closing argument when it was reminded that Oliveros was an illegal alien, acting as a paid informant for the FBI. (Tr. at 2239–40). *See, e.g., United States v. Hinton,* 683 F.2d 195, 200 (7th Cir.1982) ("[t]he standard on review for the adequacy of cross-examination on bias or motive being whether the jury had sufficient information to make a discriminating appraisal of the witness's bias or motive.")

diction through use of extrinsic evidence was properly rejected by the district court.

■ The defendants also claim that Oliveros gave evasive answers to questions and was shown to have lied repeatedly on the stand, such that their convictions rest upon "tainted" testimony. They further allege that the government failed to investigate Oliveros' Panamanian background, which they claim, was the duty of the United States Attorney. As to the instances where Oliveros refused to answer questions, when defense counsel protested at trial that Oliveros' testimony and cross-examination was evasive the judge and the prosecutor both instructed the witness to answer without hesitation. (Tr. at 1231–33, 1243–44). Defense counsel cites several instances where Oliveros claimed that he could not remember certain facts. However, most of these situations involved collateral matters, and in those instances that may have had a bearing on the charges alleged in the indictment, defense counsel was not restrained from arguing Oliveros' credibility to the jury.[9]

■ The trial record does contain a number of instances in which Oliveros was shown to have given testimony which was untruthful. His tendency to prevaricate was clearly revealed to the jury through defense counsel's cross-examination and was again emphasized during closing argument. The cases cited by the defendants where untruthful testimony was deemed inadmissible all involved false testimony that went to the heart of the substantive charges. See, e.g., Richardson v. United States, 273 F.2d 144, 147 (8th Cir.1959); United States v. Appel, 211 Fed. 495 (S.D. N.Y.1913). Here, the untruthful testimony by Oliveros concerned almost exclusively collateral matters, including his background, education, and his means of support, etc. The jury evidently found that the majority of Oliveros' direct testimony was credible, as much of it concerned sub-stantive matters affecting guilt or innocence which were corroborated by the taped conversations. In this imperfect world, a litigant must often take the witness as he or she is, imperfections and all. We cannot expect that witnesses will possess the credibility of people of the cloth, such as rabbis, priests, and nuns; that is why one of the jury's roles is to decide the credibility of witnesses. See, e.g., United States v. Noble, 754 F.2d 1324, 1332 (7th Cir.1985). Thus, it was not error to allow Oliveros to testify.

■ Finally, the defendants contend that the United States Attorney had a duty to investigate the Panamanian background of its key witness, Gilberto Oliveros. To support this argument, the defendants cite cases where the United States Attorney personally engaged in misconduct at trial, see Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), and where the government knew its witness had falsely testified that he had not been paid by the government, see Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Here, the government clearly did not "knowingly use false evidence ... to obtain a tainted conviction." Id. at 269, 79 S.Ct. at 1177. To the contrary, the trial record reveals that the United States Attorney was also surprised by evidence of his witness's "colorful" background—evidence which was only relevant as to the impeachment of the witness. The defendants' argument at best is little more than a criticism of the government for failing to do an investigation which could have provided information for impeachment. While the government always has a duty to investigate the veracity of the information and allegations made by its witnesses, "it is not the responsibility of the prosecutor ... to do the work of defense counsel ...," Ruiz v. Cady, 710 F.2d 1214, 1218 (7th Cir.1983), in assisting opposing counsel in impeaching a government witness.

9. At best, the cases cited by the defendant to support their argument that their conviction should be overturned discuss only the imposition of a contempt citation for refusals to answer questions. See, e.g., Matter of Battaglia, 653 F.2d 419, 421 (9th Cir.1981); Martin-Trigona v. Gouletas, 634 F.2d 354 (7th Cir.1980).

### III.

In the only other evidentiary issues which merit discussion, the defendants argue that the district court (1) improperly excluded a recording of a conversation between Oliveros and the FBI agents; (2) improperly admitted the testimony of Michael Velez, the man whom the defendants mentioned to Oliveros as another possible candidate for killing; and (3) improperly admitted taped conversations between Juan Williams and Oliveros which could be used against the other defendants prior to the establishment of the conspiracy. These evidentiary rulings are reversible only if the district court abused its discretion. *See, e.g., Xheka,* 704 F.2d at 984.

 The defendants complain that the district court erred when it prevented the defendants from questioning FBI agent Vina and introducing a taped May 16, 1981 conversation between Oliveros and Vina since these rulings prevented them from introducing evidence demonstrating that the government had "framed" the defendants. The district court .ruled that any statements made by the FBI agent to Oliveros were irrelevant.

In this case, we fail to understand how the conversations between the agents and Oliveros were important; rather, it was what Oliveros told the defendants which was relevant in determining whether or not they were entrapped into committing the crime. The defendants were never precluded from questioning Oliveros concerning the details of his discussions with the defendants. Further, the district court allowed the defendants to use the taped conversations if the occasion arose to impeach Oliveros on the details of his discussions with the defendants. (Tr. 611).[10] Thus, the district court did not abuse its discretion in refusing to allow introduction of this evidence.

The defendants also contend that the district court erred when it allowed the other intended victim, Michael Velez, to testify so as to verify that he was alive. Earlier at trial, the government had introduced a taped conversation into evidence in which the defendants discussed having Oliveros kill a person named Michael Velez. During this conversation, they gave Oliveros detailed information concerning Velez, including the fact that Velez had killed a brother of a friend for which he had served 1½ years of a 3-year sentence for involuntary manslaughter, that he had a relative named Johnny Taco and that he presently worked at a restaurant near Cermak and Kedzie Streets in Chicago. On appeal the defendants do not challenge that the evidence of the other "bad acts" captured during this taped conversation was admissible under Fed.R.Evid. Rule 404(b). *See United States v. Chaimson,* 760 F.2d 798 (7th Cir. 1985); *United States v. Shackleford,* 738 F.2d 776 (7th Cir.1984) (detailing the elements needed in order to establish the proper foundation for admission of other acts evidence). Although the defendant's brief is unclear on this point, they appear to contend that it was error to allow Michael Velez himself to testify at trial since his testimony had the effect of over-emphasizing the "other acts" evidence.

 Velez's testimony clearly was relevant since he verified the details given to Oliveros during a taped conversation, namely that he did in fact serve 1½ years for killing a friend of the defendants, that he did have a relative named Johnny Taco and that he was presently working at a restaurant near Cermak and Kedzie Streets in Chicago. Velez's testimony and the verification of the details given to Oliveros in the taped conversation also refuted the defense's contention, mentioned during open-

---

**10.** After reviewing the taped conversation between Agent Vina and Oliveros, we are convinced that the district court acted properly in holding that the conversation was irrelevant. In this tape, Oliveros was reporting back to the agent what had transpired during his meeting with the defendants. The tape does not contain any statements which could be construed as evidence that the FBI was setting up Oliveros to somehow entrap the defendants; rather, the tape contains some rather salty language used by the agents which, of course, was totally irrelevant to the case.

ing argument, that he did not exist. Thus, his testimony helped to demonstrate and clearly point out that the defendants were serious about their intention to kill Velez, which necessarily reflected their determination in planning to kill Gilman.[11] Thus, it was proper for the district court to allow Velez to testify.

■ The defendants also argue that the district court abused its discretion in allowing into evidence statements of Williams which were made prior to May 10, 1983, the date the defendants (Rovetuso and Hendrix) contend mark the beginning of the alleged conspiracy. Under Fed.R.Evid. Rule 801(d)(2)(E), statements of one defendant may be used against another if it is established by a preponderance of the evidence that (1) a conspiracy existed; (2) the declarant (Williams) was a member of the conspiracy; (3) the defendants were members of the conspiracy; and (4) the statement was made during the course and in furtherance of the conspiracy. *See United States v. Santiago*, 582 F.2d 1128, 1131 (7th Cir.1978). The district court admitted evidence of conversations between Williams and Oliveros that took place between April 14 and May 10 subject to a later determination that the government had established the necessary *Santiago* foundation.

■ The district court ruled that the government had in fact established this foundation. The court was entirely justified in reaching this conclusion. During an April 14, 1983 meeting with Oliveros, Williams stated that he worked for several "Italians" who were interested in having a federal witness killed. During the May 10, 1983 meeting, Williams introduced Oliveros to Rovetuso and Hendrix by stating "this is the guy." The defendants went on to discuss the demeanor of the federal witness, his appearance and how much Oliveros would be paid for killing Gilman; thus, it was obvious that they had previously discussed murdering Gilman. Further, it was known as early as March 1983 that Gilman had been cooperating with the government in the prosecution of other NIB employees. Given these facts, the district court was justified in finding by a preponderance of the evidence that the defendants were engaged in a conspiracy during the time from April 14 to May 10 to justify admission of statements made by Williams under Fed.R. Evid. Rule 801(d)(2)(E). *United States v. Brown*, 739 F.2d 1136, 1140 (7th Cir.1984). Thus, the district court did not abuse its discretion in allowing these statements into

---

11. The defendants also objected to two questions put to Velez by the government. In one question the prosecutor asked:

"Do you remember at some point in time, in response to a question you asked of me, I told you that as far as you were concerned at this point in time, that the three men that we had on tape plotting to kill you were in prison at this very time in connection with another charge to kill another man? Did I tell you that?"

The defendants also complain about the impropriety of another question put to Velez:

"In fact, in connection with that very subject matter, today before you came here to testify, were you asking the questions about what would happen if these three men were not convicted in this case; and I told you that was a decision the jury would have to make based on the evidence in the case, but I was hopeful that you would not have to worry about that; do you remember that?"

The first question was entirely appropriate as defense counsel previously asked a string of questions implying that once it had learned of the plot to kill Velez, the government did not contact him or exhibit any concern for his life. *See United States v. Taylor*, 728 F.2d 864, 874 (7th Cir.1984) (the party who opens up a subject during direct cannot complain if the other party responds in kind). As to the second question, the defense counsel had asked a series of improper questions inquiring as to whether the prosecution had told Velez whether the government needed his testimony because Oliveros was an awful liar and that the jury might catch on to the fact that the government was using perjured testimony. Certainly, this series of questions was an attempt to tarnish the image of Oliveros and impugn the integrity of the prosecutor. The prosecutor then responded by asking Velez whether he had ever made such comments and then, in question form, relayed the conversation which he and Velez had prior to Velez's taking the stand, to which the defendants now object. While the prosecutor's relaying their conversation in question form to the jury may have exceeded the bounds of permissible response, it was simply harmless error in this case.

the record. *See Santiago,* 582 F.2d at 1136.

### IV.

The defendants next contend that the evidence introduced at trial was insufficient to establish an "attempt" as charged in Count I of the indictment. Count I alleged that the defendants "did knowingly attempt to use physical force" against the witness, in violation of 18 U.S.C. § 1512(a)(2)(A). The defendants also argue that the district court improperly instructed the jury that solicitation of a person to kill a government witness may constitute the substantial step necessary to establish an "attempt" under § 1512(a)(2)(A).

▮▮▮ There is no general Federal statute proscribing an attempt, and therefore it is actionable only where, as in the present case, a specific criminal statute makes it impermissible to attempt to commit the crime. *United States v. Manley,* 632 F.2d 978, 987 (2d Cir.1980). Nor is there anywhere in the Federal law a comprehensive statutory definition of "attempt." This court in addressing the issue of what evidence will sustain a conviction for a charge of attempt to commit a crime has applied the formulation set forth in *United States v. Mandujano,* 499 F.2d 370, 376 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975):

"First, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting

. . . .

"Second, the defendant must have engaged in conduct which constitutes a substantial step toward the commission of the crime. A substantial step must be

conduct strongly corroborative of the firmness of the defendant's criminal intent." [12]

*United States v. Green,* 511 F.2d 1062, 1072 (7th Cir.1975); *see also United States v. Schramm,* 715 F.2d 1253, 1254 (7th Cir. 1983). While the defendants concede that the evidence at trial was sufficient to allow the jury to find the first element, i.e., an intent to engage in criminal conduct, they contend that their actions demonstrate only mere preparation and thus the evidence was insufficient to constitute a substantial step toward the commission of the crime. We reject the defendants' position and hold that there is more than sufficient evidence in this record to affirm their convictions.

▮▮▮ In defining the "substantial step" required in the rule recited above, the Second Circuit held that it must be "something more than mere preparation, yet maybe less than the last act necessary before the actual commission of the substantive crime." *Manley,* 632 F.2d at 987. Thus, the behavior must be of such a nature "that a reasonable observer viewing it in the context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *Id.* at 988. In determining whether the substantial step was taken in this case, the facts here are similar to those in *United States v. Brown,* 604 F.2d 347 (5th Cir.1979), in which the defendant was found guilty of attempted arson after he had solicited a federal undercover agent to blow up his grocery store. Although an agreement was reached between the defendant and the agent, the agent did not, and obviously could not, procure the explosives to complete the necessary "last act" before the commission of the substantive crime.[13] Nonetheless, in evaluating the ev-

**12.** "This definition, by shifting the emphasis from what remains to be done to what the actor already has done, was designed to widen the ambit of attempt liability, consistent with the drafters' belief that the proper concern of the law of attempts is the dangerousness of the actor, as a person manifesting firm disposition to commit the crime, not the dangerousness of his conduct. See Model Penal Code § 5.01 Comment at 26, 47 (tent. draft No. 10, 1960)."

*United States v. Ivic,* 700 F.2d 51, 66 (2d Cir. 1983).

**13.** *See also Schramm,* 715 F.2d at 1255; *United States v. Stallworth,* 543 F.2d 1038, 1040–41 (2d Cir.1976) (early police intervention prior to actual entry by the defendants into the target bank was sufficient to find attempted bank robbery).

idence on appeal, the Fifth Circuit in *Brown* held that the agreement reached between the defendant and the federal agent was sufficient to satisfy the second element in the *Mandujano* test.

■■■ The evidence in this case discloses that the defendants hired Oliveros to murder Allen Gilman and that the only reason they withdrew the order to kill was their suspicion that Oliveros was a government agent. The evidence clearly reveals that the defendants and Oliveros had agreed not only on the price to be paid to Oliveros for the murder of Gilman but also as to the nature of the execution of Gilman as well as the manner of disposing of his body. They also gave Oliveros information to identify Gilman and directed Oliveros to visit Gilman's place of employment in order that he (Oliveros) might have the opportunity to personally observe Gilman. These actions could be found to be equivocal acts not reasonably explained except as substantial steps in the commission of the crime of murder.

The defendants contend that the evidence establishes that their plan to have Oliveros purchase cocaine for them had supplanted their plan to murder Gilman and, thus, the evidence was insufficient to establish an attempt to interfere with a witness. However, the jury could easily have found that the plan to purchase the cocaine was simply an adjunct or additional matter in which the defendant sought Oliveros' assistance, similar to the plan to kill Valez and to bring back the woman from Texas, and that the cocaine transaction had merely superseded the planned killing in time, not in importance. Further, as previously noted, a person need not complete the final criminal act before he can be found guilty of an attempt. If the defendants become suspicious of the person they are conspiring with their natural and logical reaction would be to immediately exclude that person from their plans to murder the witness. That reaction was present in this case after the defendants became suspicious of Oliveros when he was unable to deliver the cocaine and traced the license plate identifi-

cation number of the car parked in front of their house to the federal government. Because the defendants became suspicious that Oliveros was a government agent, it was certainly proper for the government to arrest the defendants in order to protect the witness Gilman's life. The evidence in this case was more than sufficient to sustain the jury's verdict on this count.

■■■ The defendants also argue that the jury instruction defining attempt was an incorrect statement of the law and thus their conviction should be reversed since solicitation alone can never constitute the required substantial step necessary to establish an attempt. Except for the last paragraph, the judge's instruction essentially tracked the *Mandujano* rule:

> "To attempt an offense means willfully to do some act in an effort to bring about or accomplish something the law forbids. In order to establish an attempt, the government must have proven an act or acts by the defendants which went beyond mere planning or preparation. There must have been a substantial step in furtherance of the crime that was strongly corroborative of their original intent as indicated by their words.
>
> "The solicitation of another person to use force against Allen Gilman may constitute such an act."

The principal case relied upon by the defendants is *United States v. American Airlines,* 570 F.Supp. 654 (N.D.Tex.1983), in which the district court reviewed the common law authority and concluded that a solicitation cannot constitute an attempt. The *American Airlines* case, however, was recently reversed and the Fifth Circuit came to a conclusion directly opposite that of the district court.

> "The Federal courts have generally rejected a rigid formalistic approach to the attempt offense. Instead they commonly recognize that the determination by their particular conduct constitutes ... [an attempt] is so dependent on the particular facts of each case that, of necessity, there can be no litmus test to guide the reviewing courts. [Citations omitted.]

Following this analysis, which we consider the better reasoned approach, several federal courts have concluded that a solicitation accompanied by the requisite intent may constitute an attempt."

*United States v. American Airlines,* 743 F.2d 1114, 1121 (5th Cir.1984); *see also, United States v. May,* 625 F.2d 186 (8th Cir.1980); *United States v. Robles,* 185 F.Supp. 82, 85 (N.D.Cal.1960).

A solicitation is an asking, petitioning, enticing, or seeking to obtain by persuasion or entreaty. *Webster's Third New International Dictionary.* In this case, reading the instruction in its entirety, it states that the jurors "may" find solicitation to be an act beyond pure planning and preparation. The use of the word "may" is significant because it indicates that a jury could have concluded that an act of solicitation would be sufficient only if it found that the solicitation to be strongly corroborative of the intent to murder, in other words, if it went beyond mere asking. The evidence at trial clearly revealed an arrangement between the defendants and Oliveros that went far beyond merely "seeking" to obtain the services of a hit man. The facts in this case demonstrate that Oliveros was hired to kill Gilman and instructed to dispose of his body in a high-crime area in order to make it appear like a robbery; further, Oliveros was given information concerning Gilman's place of employment, his residence, a description of his car and his license plate identification number.

We need not reach the issue of whether the jury might conclude from the jury instruction that merely seeking to obtain a hit man is sufficient in and of itself to constitute a substantial step since an occurrence during the jury's deliberation satisfies us that the jury considered all of the defendants actions—the planning, the discussions, the providing descriptions of the witness, etc.—in assessing the attempt to murder Gilman. During its deliberations, the jury submitted the following question to the district court:

"[To] Judge Kocoras:
[Re] Count No. I
"Can you tell us if 'attempt' could be considered by the act of *securing* a hit man.
"Maybe you could locate this area in you[r] closing statement." (Emphasis added).

Before the district court could answer the question the jury informed the court that "we have an answer," and the jury's verdict of guilty was returned shortly thereafter. The term "secure" means more than a simple request, rather it denotes an agreement, and in this case an agreement to complete the final act of murder.[14] It is obvious that the jury was satisfied that the defendants and Oliveros had agreed upon murdering Gilman; therefore, we reject the defendants' contention that the jury instruction defining attempt was reversible.

## V.

▮ The defendants were charged in Count II of the indictment with obstructing justice in violation of 18 U.S.C. § 1503 as they had engaged in an "endeavor" to "arrange for the murder" of a federal witness, Allen Gilman. Section 1503 contains an omnibus clause which provides that a person who "corruptly or by threats of force, or by any threatening letter of communication, influences, obstructs or impedes, or endeavors to influence, obstruct or impede, the due administration of justice shall be fined not more than $5,000 or imprisoned not more than five years, or both." The defendants contend on appeal that they should not have been charged under § 1503 since all references to witnesses were deleted from § 1503 by Congress in 1982 when Congress passed the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 1512, Pub.L. No. 97–291, 96 Stat. 1248

---

**14.** Among the definitions of "secure" in *Webster's Third New International Dictionary* are the following:

"3(b): To put beyond hazard of losing or not receiving; GUARANTEE....

"6(a) To come into secure possession of ESP: to acquire as the result of effort."

(1982), and thus the coverage of § 1503 does not reach any conduct involving witness tampering.

The defendants raise the narrow issue that Congress, by removing the references to witnesses in § 1503 and creating § 1512, intended that the protection of witnesses fall "solely under the VWPA." Rovetuso's brief at 45. However, this position has been rejected by the majority of appellate courts addressing the issue. *See United States v. Wesley*, 748 F.2d 962, 964–65 (5th Cir.1984) (finding that defendant was properly charged and convicted under both § 1503 and § 1512);[15] *United States v. Lester*, 749 F.2d 1288, 1292–93 (9th Cir. 1984); *see also United States v. Beatty*, 587 F.Supp. 1325 (E.D.N.Y.1984); *but see United States v. Hernandez*, 730 F.2d 895 (2d Cir.1984). We agree with the well-reasoned *Wesley* and *Lester* decisions holding that it is entirely proper to charge defendants under § 1503 with interfering with the due administration of justice when the conduct of the defendant relates to tampering with a witness. The defendants argue only that witness tampering is covered *"solely* under the VWPA"; however, it is clear in light of the *Wesley* and *Lester* decisions that witness tampering may still be charged under § 1503. Therefore, we reject the defendants' argument.[16]

## VI.

Defendant, Juan Williams, also challenges the district court's rulings on various issues concerning his competency to stand trial. He also challenges the district court's handling of his post-trial motion for a new trial.

On June 17, 1983, Williams filed a motion for a judicial determination of his competence. He sought to have the court order a psychiatric examination to determine his competence to stand trial. The motion contained various observations of Williams made by Williams' counsel to support her request for a psychiatric examination of the defendant Williams. On appeal, Williams claims that the district court failed to apply the proper standard in reviewing his request for a psychiatric examination.

Williams concedes that the correct statement of the applicable standard to determine whether a competency examination is required under 18 U.S.C. § 4244 is found in *United States v. Metcalfe*, 698 F.2d 877 (7th Cir.), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 814 (1983). In *Metcalfe* this court set forth alternative grounds for denying a motion for a psychiatric examination. We held that an examination could be denied where: (1) the district court determines that the motion for an examination is insufficient in that the motion fails to set forth reasonable cause for believing that the defendant was incompetent to stand trial, or (2) the district court determines that the motion is frivolous or is not made in good faith. *Id.* at 880. We described the court's discretionary role in determining a § 4244 motion, allowing it to "conduct a hearing on factual issues to explore whether there exists reasonable cause to believe the defendant is incompetent." *Id.*

Based upon the district court judge's review of the tapes of conversations involving Williams and the judge's own observations of Williams' demeanor in court, the judge ruled that the unsworn statements of the defense counsel did not set forth a reasonable cause for an examination. He informed the defense counsel that the motion would be reconsidered if her assertions were placed in affidavit form and made more detailed. The defense counsel inexplicably failed to comply with

---

**15.** As was stated in *Wesley* when discussing the legislative history of the VWPA, "[w]e recognize that Congress ultimately enacted the House version of § 1512, whose history is different from that of the Senate bill.... Nonetheless, based upon the words of the statute which appear clear ..." the defendants were properly charged under both statutes. *Wesley*, 748 F.2d at 965.

**16.** The defendants also do not argue that conviction under both sections 1503 and 1512 violates the Fifth Amendment prohibition against double jeopardy. Thus, we do not address that issue.

the court's request. Whether her failure to comply was due to the fact that motion had no basis in fact, or was simply the result of recalcitrance is of no consequence. In either case her inaction cannot be the basis for reversal. Thus, we hold that Williams' claim that the district court improperly denied his motion for a psychiatric examination is meritless.

 On June 24, 1983, Williams' attorney also filed a motion to allow Williams to be examined at the Metropolitan Correctional Center (MCC) by his own psychiatrist. The court denied the motion, stating his belief that this motion was an attempt to circumvent the court's earlier ruling requiring a better factual basis before a psychiatric examination would be ordered. On appeal, Williams contends that the June 24 motion was not related to the earlier request for a psychiatric exam, but was simply a request for a medical examination, the denial of which violated his Eighth Amendment right to medical attention. While the record shows Williams' characterization of the motion to be correct, it does not demonstrate any violation of his Eighth Amendment right. Williams was not denied any medical treatment; during his stay at the MCC, he was examined by a staff psychiatrist at his own request.[17] The Eighth Amendment guarantees a prisoner treatment of his serious medical needs, not a doctor of his own choosing. *See Estelle v. Gamble,* 429 U.S. 97, 104–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976).[18]

 Williams also argues that the court entered into a secret, prejudicial agreement with Attorney David Schippers, who represented defendants Rovetuso and Hendrix after trial, and that the agreement resulted in the improper withdrawal of Williams' motion for a new trial.

The original motion for a new trial contained an allegation that Rovetuso was a secret government informant. The record reveals that Schippers was asked by Rovetuso and Hendrix to withdraw the motion because of their fear that such an allegation contained in a public document could endanger their safety while they were confined at the MCC. Hendrix assured Schippers that he had the authority to represent all three defendants in withdrawing this motion. Schippers then erroneously informed the court that he had been authorized by all three defendants to withdraw the motion for a new trial, and the court granted leave to withdraw this motion in a minute order. Once the court learned that Schippers did not have Williams' authorization, the motion for a new trial was reinstated. Williams has failed to show that he

17. Williams' contention that the government concealed evidence of this examination is completely meritless. The record shows Williams' attorney was informed in open court of the examination during a hearing on July 7, 1983 and was asked by the court to contact the MCC staff in order to determine Williams' mental state. Although defense counsel failed to do so, the examination was described in the presentence report for Williams. At the time of the examination, the staff psychiatrist determined that Williams may have been suffering from a mental disorder (schizophrenia), but that he was aware of all the charges against him.

18. Williams also claims that the district court improperly restricted the cross-examination of several government witnesses as to Williams' reputation for sanity in the community. After reviewing the record in this case, we hold that the district court properly sustained the government's objections to this testimony. First, Williams never gave the government any notice prior to trial that he would attempt to rely on the insanity defense. *See* Fed.R.Crim.P. 12.2(a) ("If a defendant intends to rely upon the defense of insanity at the time of the alleged crime, he shall, within the time provided for the filing of pretrial motions ... notify the attorney for the government in writing of such intention.... If there is a failure to comply with the requirements of this subdivision, insanity may not be raised as a defense.") Thus, questions asking witnesses whether they believed Williams to be insane were irrelevant. Further, questions inquiring as to Williams' reputation in the community for sanity were properly objected to since defense counsel failed to establish the proper foundation, including those witness's discussions with other members of the community as to Williams' reputation. (Tr. 1626–28). The district court did allow defense counsel to question the government witnesses as to their observations of Williams. These questions were proper as Williams' intent to commit the crime was an issue at trial.

was prejudiced by the court's rulings and thus his assertion that he was stripped of his rights in the "backrooms of the 21st floor of this building" is entirely without merit.

The convictions of the defendants are affirmed.[19]

**19.** This panel has noted the decision in *United States v. Murphy*, 768 F.2d 1518 (7th Cir.1985), issued July 19, 1985 where allegations of personal friendship and lack of impartiality were raised relating to the alleged friendship between Judge Kororas and United States Attorney Webb. Although the allegations in that case are similar to but quite distinguishable from those in this case, we are convinced that the allegations in this case are without merit.